AMERICAN GRAPHOPHONE CO. v. UNIVERSAL TALKING MACHINE MFG. CO.

(Circuit Court, S. D. New York. February 19, 1906.)

PATENTS—ANTICIPATION—PROCESS FOR MAKING SOUND RECORDS.

The Jones patent, No. 688,739, for a method of producing sound records for use in talking machines of the gramophone type, in which the original record is produced by cutting or engraving the sound groove on a plate of waxlike material by means of the vibrations of the stylus, and a metallic matrix is formed thereon by electrolysis, from which the duplicate records are made by impression, is void for anticipation in the prior art.

In Equity. On final hearing.
See 118 Fed. 1020.

Elisha K. Camp (Philip Mauro and C. A. L. Massie, of counsel), for complainant.
Horace Pettit, for defendant.

HAZEL, District Judge. This action relates to the validity and infringement of patent No. 688,739, dated December 10, 1901, granted to Joseph W. Jones, on application filed November 19, 1897, for production of sound-records. The suit was originally brought by the patentee, but subsequently the American Graphophone Company acquired the absolute ownership of the patent by purchase, and thereupon a supplemental bill was filed bringing in the present complainant. This invention has for its particular object a method of duplicating or producing copies of an original sound-record of the zigzag

type, which was especially adapted for use in a talking machine known as the "Gramophone," invented by Emile Berliner. At the date of the patent in suit, the phonograph, the invention of Edison, the graphophone, the invention of Bell & Tainter, and the gramophone were known to the art and their distinguishing characteristics well understood. A brief summary, therefore, of the different styles of sound-records will suffice. Original sound-records of the Berliner patent, No. 548,623, consist of flat zinc records having etched on their surfaces a great number of infinitely small undulatory grooves of uniform depth,. representing sound-waves. The sound-record of the invention adapted for use in talking machines, of which Mr. Edison and Messrs. Bell and Tainter were the inventors, consisted of cylindrical tablets having cut or engraved on their surfaces vertical undulations or irregularities of varying depth. In this controversy, we are not concerned with the construction of a machine or apparatus embodying the reproducing style, the adjustment of the record tablet, the reproducer diaphragm, the laterally undulating record, nor, indeed, the mechanical steps by which the record is enabled to effectuate the result. The distinctive purpose of the patentee, as stated by him, was the process or method of duplicating or multiplying a sound-record having lateral undulations of even depth. This object involved the method already known of producing the original or master record, the subsequent steps of making a metallic matrix by electrolysis, separating the same from the original record, and thereupon repeatedly pressing the matrix into a suitable yielding material so as to produce a vendible article. The claims which are descriptive of the alleged invention read as follows:

"(1) The herein described method of producing sound-records, which consists in cutting or engraving upon a tablet of suitable material, by means of the lateral vibrations of a suitable stylus, a record-groove of appreciable and practically uniform depth and having lateral undulations corresponding to the sound-waves, next coating the same with a conducting material, then forming a matrix thereon by electrolysis, and finally separating this matrix and pressing the same into a tablet of suitable material, substantially as described.

"(2) The process of producing commercial sound-records of the type indicated, which consists of first preparing a flat tablet or disk of soft waxlike material, then engraving thereon by means of the lateral vibrations of a suitable stylus a record-groove of appreciable and uniform depth and having lateral undulations corresponding to sound-waves, next rendering the surface thereof electrically conductive, then forming a matrix thereon by electrolysis, next separating the matrix from the original record disk without the use of heat, and finally impressing said matrix into a disk of suitable material to form the ultimate record, substantially as described."

Claim 2 contains the element of removing the matrix from the master record without the employment of heat. In other respects it is similar to the first. The defenses interposed are anticipation, noninfringement, want of patentability, in that the process described in the specification is for a mode of operation in which no elemental change is accomplished or chemical action effected. The latter defense will be briefly considered first. Does the process disclose a patentable invention? Assuming that the patent does not involve a chemical effect, though electroplating is one of the elements, it never-

theless is thought that the series of acts described in the Jones patent produce a definite and useful result essentially different from that described in the patents to Berliner, and one that would be patentable if the steps taken were not fully disclosed in patents of prior date. It is always important in considering a process patent to have in mind the fact that a similarity of machinery used to effectuate the result is wholly immaterial. Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968. The patent is granted for the way the thing is accomplished, including the series of steps used to produce the article. That an old result brought into existence by a treatment upon certain materials theretofore unknown is entitled to the protection of the patent laws cannot be disputed. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 514; Lawther v. Hamilton, 124 U. S. 1, 8 Sup. Ct. 342, 31 L. Ed. 325; Eastern Paper Bag Co. v. Standard Paper Bag Co. (C. C.) 30 Fed. 63; Crane v. Price, 1 Web. Pat. Cas. 626. By analogy, the same principle governs a process which depends upon the correlation of different mechanical elements to accomplish a new and beneficial result. In Kirchberger v. American Acetylene Co. (C. C.) 124 Fed. 764, affirmed 128 Fed. 599, 64 C. C. A. 107, Judge Ray comprehensively stated the rule as follows:

"When a patented process or machine proves a failure, is inoperative, and another follows, and is a success, in its operation, the latter is a new invention and patentable, even though we have the same machinery or parts of machinery, but they are combined or put together in a new way; and this is true even if the latter combination closely follows and resembles the first, provided there be a difference. In such case it is evident that the later patentee has succeeded where the other failed; that he has discovered or invented the desired, thing to accomplish a new and useful result; that his change, however unimportant it may seem to the observer, is the key to the whole situation."

That a sound-record of the type in question, and the materials by which the result is attained (except the graving element), separately considered, were familiarly known, is not seriously disputed. Nor is it contended that the patentee was a pioneer in making sound-records. Whether the different steps of the process in suit were old must be ascertained by an examination of the antecedent art. Such art as understood by the patentee is thus stated in the specifications:

"Heretofore, records of this character, generally known as 'gramophone records,' have been produced by first tracing the lateral undulations or zig-zags in a fatty (inky) film that protects an etching-surface, then etching this tracing into the material to form a groove, then running a blunt stylus through this groove to smooth the ragged etched surface, and finally electroplating this touched-up surface and pressing the matrix so formed into a suitable material to form the commercial record."

The above method, at the date of the invention, was concededly practiced to produce the master record of the gramophone, as claimed in patent No. 382,790, and in later improvements patents issued to Mr. Berliner. The elicited facts show that the departure of the patentee from the process of Berliner consisted of abandoning the etching feature and adopting in its stead a method of cutting or engraving in a substance of less resistence. Complainant claims that the process by which cylindrical records were engraved is unsuitable

to sound records having a groove of uniform depth. This claim, however, is stoutly resisted by the expert witnesses for the defendant. The question is whether Jones discovered a radically different method for duplicating sound records of the zigzag type. The patentee, further describing his process, says:

"This original record is then (after cutting or engraving the wax) prepared for receiving the electroplate deposit by coating its surface with an electric conducting medium, such, for instance, as carbon (graphite), as commonly employed in the process of electroplating, or, as a substitute, nitrate of silver. This coated plate is then placed in an electroplating bath, and a layer of metal (nickel, steel, etc.) is deposited upon it. The thin shell or matrix thus formed is then separated from the original record, which may be used repeatedly in the same manner, to form other matrices."

The evidence shows that the lateral undulations after engraving the material appear upon the matrix in the shape of a ridge, thus enabling an exact reproduction of the original sound grooves upon suitable material. The defendant claims, and the proofs show, that the Jones process was practiced and applied to cylindrical records in several prior British and American patents. Stress is placed by complainant upon the important element of engraving a waxlike composition from which a suitable metallic matrix could be made; but, in view of the state of the art, its novelty is doubtful. In the Rosenthal & Frank patent, No. 474,410, of 1892, a method of scratching a laterally undulating groove directly upon the record tablet is shown. This patent does not suggest a method of duplicating the record, and accordingly is of doubtful relevancy. The Adams-Randall British patent of 1889 simply indicates engraving upon a waxlike substance a record such as is claimed in the specification in suit, but no process for making a matrix and reproducing a record therefrom is shown. The Edison (British) patent to Gouraud, No. 12,593, of 1888, discloses means for cutting or engraving a laterally undulating groove of uniform depth. No electroplating process for producing a matrix is described, but the feature of cutting or engraving in a flat sheet or tablet of wax is clearly shown. In the Edison (British) patent to Gouraud, No. 15,206, of 1891 (Figure 20), a similar method is disclosed. By these publications it is apparent that the idea of cutting or engraving a sound-record of uniform depth did not originate with Jones, although it may be doubted whether the patents mentioned contemplated the precise process in suit. An important reference is the United States patent to Edison, No. 382,419, of 1888, in which is shown a duplicating process, including as an element a metallic matrix. The specification says that in a prior patent the patentee disclosed a process of depositing a layer of metal over the surface of a wax cylinder, and then dissolving out the wax, leaving upon the inside a mould of the record. It is practically admitted that the prior British patent, No. 1,544, of 1878, was unsuccessful, and accordingly the patentee conceived the idea of depositing metal over the recording surface of a wax phonogram of the cylindrical type and melting the wax so as to lengthwise separate the cylinder. The patent states:

"The result is a flat or cylindrical knurling surface having the record in relief, so that by rolling a wax phonogram-blank upon it the original record will be reproduced."

The patent further states:

"The duplicate phonogram-blanks * * * are preferably of a wax composition, which is too hard to be practically indented directly in the phonograph, although softer compositions may be employed, or materials other than wax."

It will be observed that the element of engraving a sound-record on a cylindrical wax tablet and forming a matrix by electrolysis directly from the master record is here shown. The specification omits to indicate the particular type of record to which the process is applicable, but it is quite probable that Mr. Edison had in mind a record of the vertically undulating type. I am unable to agree with complainant that cutting or engraving upon a cylindrical wax record, as stated by Edison and Gouraud patents (though it may not have been in hard wax), followed by electroplating and using the matrix to duplicate vertical undulations, did not suggest the Jones process.

This brings me to another important reference cited by the defendant in anticipation of the claims in suit. It is a close approach to the Jones invention, though likewise referring to a cylindrical record. In the British patent to Young, No. 1,487, of 1894, a clear process for duplicating the article in question is shown. There, the record was prepared upon a wax cylinder, then coated with plumbago in order to make it electrically conductive, and then it was immersed in an electric copper-plating bath, giving it a metallic surface. Upon removal it was heated and the wax drained off, leaving the original wax impression in relief upon the reverse side of the electroplating. The patentee then inserted therein a cylinder of celluloid, rubber, or other yielding material. In this manner correct impressions from the electroplate were taken, and, when the yielding material became cool, the duplicate record could readily be removed from the electro. The specification also states that the process related "to the phonograph, graphophone, gramophone and similar sound recording and reproducing instruments." Complainant claims that this process was impracticable, and various obstacles are raised against its favorable consideration. It is urged that the master record, because of the necessity of melting the wax, must be destroyed and the duplicate must be collapsed before it can be withdrawn from the matrix. It is obvious that slightly different steps would be necessary to produce a flat matrix, and that it would be unnecessary to dissolve the master record if the process were applied to records of the zigzag type. The skilled artisan doubtless would have had little difficulty in adjusting the various elements, so that a flat sound record of the type in question could have been produced without experimentation or the trials of an inventor. I think that the patent not only indicates that the process described might substantially be used in the way pointed out by Jones, but also that the patentee contemplated the application of his invention to the disk record. Moreover, that it was old at the date of the Jones invention to engrave or cut a sound record of uniform depth

directly upon a so-called master matrix finds support in the testimony of Berliner, Sanders, and Levy, witnesses for the defendant in an action brought by complainant against the American Record Company, which was argued and submitted before this court at the same term that this action was submitted, but which has not yet been decided.   It appears from such evidence that a number of sound-records were cut or engraved, as distinguished from the etching process, by Mr. Berliner during the summer of 1896; the grooves being directly cut or engraved in lead and copper plate without applying any etching material.   In this situation, giving consideration to the prior state of the art, the cutting or engraving on a wax composition is not thought to have been a patentable discovery.   But complainant vigorously insists that the Jones process went into immediate use, displacing other methods of duplicating records, and accordingly must be regarded by the court as a meritorious and patentable improvement.   The force of this argument, however, is not perceivable, in view of the fact that the Bell & Tainter patent, No. 341,214, of May 6, 1886, owned by the complainant, and to which I have not yet alluded, broadly claimed the process in suit.   Claims 1 and 9, fairly indicating the character of the invention, read:

"(1) The method of forming a record of sounds by impressing sonorous vibrations upon a style, and thereby cutting in a solid body the record corresponding in form to the sound-waves, in contradistinction to the formation of sound-records by indenting a foil with a vibratory style, or cutting a strip by vibrating it against a revolving disk cutter, substantially as described."

"(9) The method of forming a sound or speech record which consists in engraving or cutting the same in wax or waxlike composition, substantially as described."

Referring again to the evidence in the suit against the American Record Company, the document filed in October, 1881, by Bell & Tainter, in the Smithsonian Institute at Washington, specifically refers to the feature of cutting or engraving both the vertically undulating and zigzag process and to the duplication of phonograms.   The specification, inter alia, omitting nonessentials, says:

"The essentially new feature * * * is the removal of material to form the record by a cutting, gouging or graving action of the vibrating style, * * * in engraving or cutting the record in a waxy or amorphous and slightly cohesive substance."

And further:

"In combining with the disk of a recording and reproducing apparatus in which the record is formed on the face of said disk in a volute or spiral by cutting or otherwise by any known suitable means, mechanism for giving to said disk a uniform surface speed under the recorder."

That the recording mechanism was of the vertically undulatory type, and not the uniform depth type as already intimated, is unimportant. Both types are closely allied and, as said, commonly understood.   The quoted claims of the Bell & Tainter patent were broad, and the specification does not indicate a narrow scope.   It is thought plain from the evidence that Berliner felt constrained to await the expiration of the Bell & Tainter patent before practicing a process which he believed

145 F.—41.

was covered by the said claims. Upon this point, after narrating certain prior experiences, in relation to cutting the record in a hard material, he testifies:

"In fact, this whole matter of cutting a gramophone record directly in wax or other solid material was thoroughly familiar to all of us, but, on account of the very broad scope of the Bell & Tainter patents, no attempt was made to make such records for commercial use, because we felt sure that the Bell & Tainter patents would be sustained against them, and, as I had interested outside capital in the gramophone, it was my aim to steer clear of all legal entanglements as much as possible and give them a free field in which to work."

The next point relates to the lecture published by Mr. Berliner at Philadelphia, on the subject of the gramophone, in which he mentioned certain disadvantages in the sound-record, and it is claimed that he was endeavoring by experimentation to overcome the problem or difficulties in his process. The evidence indicates that Mr. Berliner did not mean to be understood as stating that his process was defective or inoperative, but that he simply meant to make clear to his audience that the surfaces of the duplicates were not polished or finished in appearance on account exclusively of the inefficiencies of the electrotypers. It also appears in evidence that Mr. Berliner filed an application for a patent, claiming that the process as described in the patent in suit was his invention. An interference was declared between him and Jones, and priority of invention awarded to the latter. From this occurrence, the inference is suggested that the Jones process was a marked advance in the art. While the proceeding was pending in the Patent Office, the later application of Berliner was withdrawn by him on the ground that the process was not patentable. According to the explanation of the witness Berliner, the plausibility of which is apparent, he thought that there was no substantial reason why the views of the Patent Office in relation to the alleged invention should not be ascertained, especially as Jones claimed to be the inventor. The file wrapper and contents show that the patent in controversy was rejected about eight times, upon the ground of want of patentability, in view of the prior patents to Edison, Berliner, No. 548,623, Young, Rosenthal & Frank, Bell & Tainter, and Gouraud, No. 15,206. Subsequently, however, the patent was granted by the commissioner of patents, owing, doubtless, to the earnest and skillful arguments of counsel that the process differed essentially from the prior art, and also that harmful effects of the process then in use were removed by the improvement.

It is urged by counsel for complainant that the process described in the Berliner patent was incapable of duplicating the sound-records with the high degree of success attained by the improvement patent, but the claim is not sufficiently established by the evidence. This is not a case wherein the substitution of one thing for another accomplishes a beneficial result which the skilled in the art had in vain sought to bring about. In other words, the step by which the tablet is cut into or engraved by the lateral movements of the stylus, instead of such undulations being traced or etched, was perhaps a step for-

ward. Old ideas and suggestions, however, which are found in prior publications, were used to produce the better result. This achievement did not involve the ingenuity of an inventor, but comes within the limits of the skilled in that class of workmanship. What the patentee accomplished is thought to fall within the rule laid down in the following cases: Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899; Smith v. Nichols, 88 U. S. 112, 22 L. Ed. 566; Pennsylvania R. Co. v. Locomotive Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222.

Inasmuch as the proofs satisfy me that the patent in suit is anticipated by the prior art, it follows that the bill must be dismissed, with costs.