### STANDARD SANITARY MFG. CO. v. ARROTT (two cases).

(Circuit Court of Appeals, Third Circuit. February 28, 1905.)

Nos. 60, 61.

1. ESTOPPEL—NECESSITY OF PLEADING—WAIVER OF OBJECTION.

Where, in a suit in equity, testimony of facts which it is claimed raise an estoppel against one party is introduced without objection, and contentious testimony disputing such facts is produced on the other side, the contention for an estoppel may be made at the hearing without having been pleaded.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Estoppel, §§ 299–303.]

2. SAME—MATTERS IN PAIS—PROOF.

Where an equitable estoppel is relied upon, the facts upon which it is based must be proved with particularity and precision, and nothing can be supplied by inference or intendment.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Estoppel, § 308.]

3. SAME—ACTS CREATING.

In the absence of expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites.

4. PATENTS—EQUITABLE TITLE—EVIDENCE TO SUPPORT.

Evidence considered, and held insufficient to sustain a claim to the equitable ownership of a patent as against the patentee, either on the ground of contract or estoppel.

5. SAME—LICENSE—IMPLIED CONTRACT.

No implied contract of license to use a patented device, arising from the circumstances under which the patent was taken out and the relations of the parties, can be set up in the face of a proved express contract of license.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 131 Fed. 457.

Walter Lyon and John R. Bennett, for appellant.

M. A. Christy, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. These are appeals from the decrees of the Circuit Court for the Western District of Pennsylvania, in cross-suits in equity. The first was by a bill filed by the appellee, James W. Arrott, Jr., complainant below, against the appellant, Standard Sanitary Manufacturing Company, defendant below, for the infringement of letters patent No. 633,941, entitled "An improvement in dredgers for pulverulent material," an appliance for sifting powdered substances. To this suit, the company made answer, setting up two defenses, to wit: (1) Alleged prior knowledge and use of the invention by a person other than the patentee; (2) an alleged contract by Arrott to convey the patent to the company, and consequently an equitable title in the company thereto. Shortly after filing its answer in the original suit, the appellant company filed a cross-bill, setting up its alleged equitable title to the patent and praying a decree for the specific performance by Arrott of his contract to make conveyance thereof. The appellee, Arrott, in his answer to the cross-bill, denied the material allegations, and specifically the existence of any title in complainant, and the making of the contract alleged. The cases were heard together in the Circuit Court, upon the pleadings and proofs. The court below decided that the alleged prior knowledge and use had not been sufficiently proved, and upon the question of equitable title found against the company appellant and in favor of Arrott, the appellee. In consequence of these findings, a decree was entered in the cross-suit for specific performance, dismissing the bill therein, and in the original suit by the appellee, for infringement, a decree was entered granting the injunction prayed for, and referring the case to a master for an accounting. The invalidity of the patent, on the ground of the alleged anticipation, has not been urged before us, so that the only assignments of error with which we are concerned, are those which relate to the equitable title alleged by the appellant in its answer to the infringement suit, and in its bill of complaint praying for a specific performance of an alleged contract to convey the patent.

The appellant, the Standard Sanitary Manufacturing Company, was a corporation created for the purpose of taking over the plant, good will, fixtures and property (including the patents) of several companies, among them the Standard Manufacturing Company (sometimes called the old company), all engaged in the same or similar business. This it did December 31, 1899. The stock of the old or Standard Manufacturing Company, was nearly all owned by James W. Arrott, Sr., father of the appellee, and Francis J. Torrance. James W. Arrott, Jr., the appellee, owned 200 shares, or one-eightieth of the capital stock, and his brother, C. F. Arrott, was also a small stockholder.

We think the learned judge of the court below, in the following extract from his opinion, has fairly summarized the pleadings in both suits, so far as they relate to the alleged equitable title:

"2. In respect to the alleged equitable title of the Standard Sanitary Manufacturing Company to the said patent, the averments of that company contained in its answer to the original bill, and in its cross-bill against James W. Arrott, Jr., are in substance these, namely: That Arrott was a stockholder and director of the old Standard Manufacturing Company, and that while thus interested in that company and employed as its superintendent at its Allegheny City factory, and under his contract was to use his best

endeavors to advance the interests thereof and improve and perfect appliances to be used in its business, the improvement constituting the subject-matter of letters patent No. 633,941 was made and reduced to practice and afterwards used in the business of said company, and the expenses incurred in procuring the patent were paid by that company; that said patent was taken and held by James W. Arrott, Jr., in trust for said company, and was used by the said company until the beginning of the year 1900 with the consent of the said Arrott, it being the equitable owner of the improvement and patent; that on December 30, 1899, certain property of the Standard Manufacturing Company, including its plant in Allegheny City, and all its patents, whether held in its own name or in the names of others, were sold to the Standard Sanitary Manufacturing Company; that on the 26th of January, 1900, James W. Arrott, Jr., entered into a contract with the Standard Sanitary Manufacturing Company, by which he was employed as general superintendent of the factory in Allegheny City at an increase in salary, and by which he confirmed to the Standard Sanitary Manufacturing Company the right to patent No. 633,941, and he thereby agreed to assign to that company the said letters patent; that Arrott continued from the date of this contract, January 26, 1900, until about May 19, 1901, as general superintendent of the Allegheny City factory, from which position he resigned on the date last mentioned, and that the right of the Standard Sanitary Manufacturing Company to said letters patent and the use of the improvement was never denied by James W. Arrott, Jr., until after his resignation of said position.

"In his answer to the cross-bill of the Standard Sanitary Manufacturing Company, James W. Arrott, Jr., denies that under his contract with the old Standard Manufacturing Company, he was under any obligation to make inventions for that company, or to transfer to it or hold for its use and benefit any letters patent he might obtain, and denies that that company ever became or was the owner in law or equity of letters patent No. 633,941; he avers the fact to be that the use of said improvement was originally commenced by the Standard Manufacturing Company with his knowledge and consent in the expectation and contemplation of a satisfactory agreement between that company and himself with relation thereto, and that thereafter, to wit, on October 23, 1899, that company through its board of directors expressly recognized his title to said improvement and letters patent, and it was then and there agreed between himself and the company that the company should pay to him for the privilege of using the improvement at its factory a royalty or compensation which should be satisfactory to him, and that thereafter that company used the improvement under and subject to that agreement; he admits that on January 26, 1900, he entered into a contract with the Standard Sanitary Manufacturing Company under which he was employed as general superintendent at the Allegheny City factory, but not at an increased salary, but at the same salary he had formerly received from the Standard Manufacturing Company, and that he continued in the employ of the Standard Sanitary Manufacturing Company under that contract until about May 19, 1901, when he resigned his position and left the company's employ; he denies that by the contract of employment of January 26, 1900, he confirmed to the Standard Sanitary Manufacturing Company the right to the patent No. 633,941, and denies that he thereby agreed to assign said letters patent to said company; he avers that at the time he entered the employ of the Standard Sanitary Manufacturing Company, and thereafter until he left its employ, he was ready and willing to grant to that company a license under his said letters patent to use the improvement upon the payment to him of a satisfactory royalty or compensation therefor, and that he so advised the managing officers of that company; he denies that he ever at any time consented to the use by that company of the said improvement otherwise than under the understanding that he should be duly compensated therefor; he further denies the averment in the bill of complaint that he did not prior to his resignation on May 19, 1901, deny any alleged right of the Standard Sanitary Manufacturing Company to the said letters patent or to the use of the improvement, and avers the fact to be that during his term of employment he gave to that company notice, through one or more of its proper officers, of the said letters patent and his claims thereunder and de-

nied the right of the company to use the improvement without making due compensation to him; and he expressly denies that the Standard Sanitary Manufacturing Company, by the contract of employment of January 26, 1900, or otherwise, acquired any equitable title or interest in or to the said letters patent."

We agree with the statement of the learned judge, that the answer of James W. Arrott, Jr., is responsive to and traverses all the allegations of the cross-bill, upon which the right of the appellant, the Standard Sanitary Manufacturing Company, to equitable relief depends.

From the testimony on both sides, as fully set out in the record, it appears that at the date of the application for the patent, March 21, 1899, to which the appellant claims title, and for several years prior thereto, Arrott, Jr., the appellee, was and had been superintendent of the enameling department and a stockholder and director in the old or Standard Manufacturing Company, engaged in the manufacture of enameled goods, and continued to occupy that position until the latter part of the year 1899, when that company and others engaged in the same business were consolidated, the new company being known as the Standard Sanitary Manufacturing Company, the appellant in these suits. As already stated, he owned about one-eightieth of the stock of the said old company, his father and Dorrance owning (with the exception of a small holding by his brother) the balance thereof. For some time prior to March, 1899, the appellee, being superintendent of the enameling department, had been endeavoring to devise a new and improved apparatus for sifting the enameling powder upon bath tubs and other utensils and articles to be enameled, and finally invented the device of the patent in suit, for which, upon application made by him, he received letters patent, dated September 26, 1899. During the year 1899, and shortly prior to the issuance of the patent, this patented enameling device had been installed in the enameling department of the old company, of which the appellee was superintendent. In working out his invention, the appellee had the services of employés of the company in making models, etc., and it is admitted that the company defrayed the expenses attendant upon the application for and granting of the patent to the appellee. The patented device was used by the old company without special contract or license from the appellee, but without objection on his part, and without any understanding as to the terms upon which it should be so used, until October 23, 1899, when, at a meeting of the board of directors of the old company, at which the appellee was present, the following resolution, offered by Mr. Dorrance, was passed and recorded in the minute book:

"The matter of recognition of enameling appliances invented by J. W. Arrott, Jr., and appliance for molding bath tubs invented by J. C. Reed, was discussed, and it was agreed that such recognition be made on a royalty basis satisfactory to the said J. W. Arrott, Jr., and J. C. Reed."

There is no evidence that, after the date of this minute, any contract or understanding with reference to the said patent, other than that outlined in the minutes above quoted, was ever had between the appellee and the old company, or its officers, down to the consolidation into the new company, December 31, 1899. Shortly after or shortly prior

135 F.—48

to the passage of this resolution, negotiations were commenced by Arrott, Sr., and Dorrance, with the representatives of certain other companies, for the consolidation of all the companies into the new company, called the Standard Sanitary Manufacturing Company, the appellant here.

During the period of these negotiations, certain representatives of the companies with which consolidation was proposed and afterwards effected, visited the plant of the old company for the purpose of inspection. The appellant much relies upon the testimony given by two or more of these representatives, to the effect that they were shown through the enameling department by the appellee, Arrott, Jr., who exhibited and explained the enameling process invented by him and descanted upon its advantages, but was silent, so they testify, as to any claim made by him as to ownership of the patent. Frequent meetings between representatives of the different companies were had down to the consummation of the consolidation scheme, December 31, 1899, when conveyance was made to the new company appellant of the stock of the old company, together with its plant, real estate, fixtures and all patents owned by it. No copy of the instrument of conveyance is exhibited in the record, but it seems agreed that there was no specific mention made of any patents, and certainly not of the patent here in question. In behalf of the appellant, it was testified by Dorrance, who with Arrott, Sr., were the principal owners in the old company, that he, Dorrance, had taken out patents at various times, some of which he assigned to the company and others held in his own name until the time of the combination, but he considered that they all passed to the new company, and that his understanding was that the patent of Arrott, Jr., passed in the same way, notwithstanding that he told the representatives of the other companies that the patent to Reed would not pass. There is no statement from Arrott, Sr., as he died before the taking of the testimony.

The claim is made by the appellant, the new company, that a definitive contract was made between it and James W. Arrott, Jr., by which the company acquired the equitable title to the patent in suit. Such a contract, of course, must have been made after December 31, 1899, the date of the consolidation, and was in fact alleged to have been made January 26, 1900. The learned judge of the court below has made a finding of fact as to this alleged contract, as follows:

"Immediately after the new company commenced business in January, 1900, Arrott was directed to send one of the patented dredgers to the Dawes-Myler plant at New Brighton, Pa., that being one of the constituent concerns constituting the new company. Thus it was that Arrott came to write the letter [of January 17th]. It contains the following clause: 'Yours of the 12th received, and am pleased to know that the dredger is satisfactory. I wish to state to you simply as a matter of record that the patent on the dredger belongs to me and that the Standard Manufacturing Company has given me credit for the invention and made satisfactory arrangements for its use here. I am not, of course, worrying about the action of the new company in regard to such matters, but do not wish the adoption of the dredger in your works to mean that I acknowledge the right of the Standard Sanitary Manufacturing Company to use the same without any consideration.' According to the testimony on behalf of the new company, the alleged contract between it and James W. Arrott, Jr., by which the company acquired the equitable title to

patent No. 633,941, was entered into at a meeting of the executive committee of the company held on January 26, 1900. The witnesses on the part of the company to show the alleged contract are Messrs. Myler, Cribben, Dawes and Ahrens. These gentlemen are all stockholders in the new company. It seems very clear from what these witnesses say, that the employment of Arrott and its terms were agreed on before any question was raised in respect to his patent. His salary was to be the same as that he had previously received from the old company, with an undefined further contingent based on the future result of the business. Mr. Dawes states: 'After the salary was fixed up, he asked the question, what was going to be done with reference to his patent dredger. Different members of the committee stated that as far as they were concerned he had no patent dredger; that the dredger was a part and parcel of the plant, and had been turned over with the plant by the stockholders of the Standard Manufacturing Company.' And Mr. Dawes proceeds to state that a heated conversation followed. It can hardly be said that any of the witnesses on behalf of the company testify directly to the specific terms of an agreement between the company and Arrott in respect to the patent, but their testimony indicated a belief on their part that Arrott had consented to the claim of the company that it had acquired the patent by purchase from the old company. Mr. Arrott himself testifies positively to the contrary and states that in the interview from first to last he denied the claim set up by the new company and refused to recognize it. It appears from the company's own testimony that a minute of the proceedings of that meeting was made at the time by Mr. Myler, the secretary of the company, and was entered upon the minute book (as of January 26th, 1900). That minute is an exhibit in this case offered by each party. So far as it is important to this controversy, I quote the minute at length, to wit: '* * * Mr. Charles F. Arrott and James W. Arrott, Jr., then came before the committee, and after quite a discussion as to plans, management, etc., of the Standard Manufacturing Company, Mr. C. F. Arrott signified his entire satisfaction and the committee agreed to enter into a contract with him at an annual salary of $3,600 as manager of the Allegheny Works and a further contingent based on the result of the business at the said Standard Mfg. Co.'s Works. It was then agreed to enter into a contract with Mr. James W. Arrott, Jr., as general superintendent of the Allegheny Works, known as the Standard Mfg. Co. Works, on a salary of $3,600 per year, with the same understanding as to contingent as with Mr. C. F. Arrott. Further it was the general understanding of the members of the executive committee that the Standard Sanitary Mfg. Co. own and control, and that the same should be transferred to this company, the patents obtained by James W. Arrott, Jr., and those in process or already applied for with reference to the dredging of enamel. The company's control of these patents it is understood is in the United States only, and Mr. James W. Arrott, Jr., was advised to this effect. * * * W. A. Myler, Secretary.' This minute in my judgment is decisive against the allegations of the company that Mr. Arrott entered into an agreement upon which the company relies. It contains in clear terms a memorandum of what was agreed on between Arrott and the company in respect to his employment. This is the only agreement with him recorded. If there had been any such agreement made in respect to his patent as the company alleges, undoubtedly it would have been stated in the minute, which Mr. Myler himself testifies contains a correct record of the facts as they occurred at the meeting. It will be perceived that the minute merely sets forth what was the 'general understanding of the members of the executive committee' in respect to the patent, and that Mr. Arrott was so 'advised.' "

A careful examination of the testimony contained in the record convinces us that the learned judge was correct in his finding of fact, and that no express contract between Arrott, Jr., and the new company, as set up in the answer to the infringement suit and in the bill for specific performance, was ever made. As equitable title, founded upon such alleged contract, is the chief defense in the in-

fringement suit, and the sole ground for the relief sought in the bill for specific performance, the approval of this finding by the court below would dispose of the appeals in both cases before us, were it not that it is urged in argument that the appellee was estopped by his acts and conduct during the period of the negotiations leading up to the consolidation of December 31, 1900, and thereafter denying title to the patent in suit in the appellant, or asserting the same in himself. Counsel for the appellee denies the right of appellant to rely upon or urge such an estoppel, for the reason that the same was not pleaded, either in the defense to the infringement bill or in the bill for specific performance. We hold, however, that where, in a suit in equity as in this case, testimony as to facts, upon which an estoppel is contended for, is introduced, not only without objection but contentious testimony disputing such facts is produced on the other side, the contention for an estoppel may be made at the hearing without having been pleaded.

We therefore have considered the question, whether the evidence in this case discloses facts upon which an estoppel may be predicated against the appellee. The contention is, that prior to the consolidation of the old company in the new, December 31, 1899, and during the negotiations for said consolidation, it was assumed between the representatives of other companies than the old Standard Company, that all patents, including appellee's patent for this enameling process, were to go with the plant and other property to the new company. There was testimony that representatives of the old company had dwelt on the importance of this patent as enhancing the value of what they had to contribute to the new company, and there is a general statement by two of the witnesses, that Arrott, Jr., was present at some of these interviews, where some of these things were discussed in his presence. We do not find, however, that any specific occasion is testified to with particularity and clearness, to establish the fact that Arrott, Jr., was present when such representations in regard to his patent going with the other property into the new company were made, or that he either assented thereto, or by his silence intentionally or negligently allowed the other parties to the negotiations to believe that such a conveyance was to be made. He himself testifies that he was present at only one interview, and that was the last before the consolidation, and that at it nothing was said in regard to the transfer of his patent to the new company. We agree with the learned judge of the court below in his finding in this matter. Where an estoppel is relied upon, the facts upon which it is based must be proved with particularity and precision, and nothing can be supplied by inference or intendment.

The same may be said of the testimony introduced by appellant, regarding the visit of the committee of three or four persons from the other companies to the enameling department, during their inspection of the works of the Standard Manufacturing Company, pending the negotiation for consolidation. The members of the committee visited the works, and together were shown through the enameling department by the appellee. The testimony of four of

them is in the record. They all say that the appellee explained·the working of his department to them, and, among other things, the patent pneumatic dredger; that the appellee dwelt upon the advantages of this device, but said nothing about his claim to ownership, and all united in testifying that they thought, during their inspection, that the patented device belonged to the old company and would go with its plant to the new company. But none of these witnesses testify that any statement was made in the presence of the appellee, that their understanding was that the patented dredger would go with the plant to the new company, and that appellee expressly or by silence acquiesced therein, or was in any way responsible for this understanding, which, if it existed at all, probably arose from their negotiations with the managing officers of the old company. There is no testimony that anything was said in regard to the understanding had by these representatives of the other companies, which required an express assertion of title on his part.

We are of opinion that this testimony falls short of establishing the essential elements of an estoppel. All that occurred between the appellee and the members of the visiting committee during their tour of inspection, was consistent with the belief on appellee's part in his complete ownership of the patent, and with his understanding that the use by the old company of the device was pursuant to his permission under his agreement with the old company, as evidenced by the minute of October 23, 1899. In the absence of expressly proved fraud, there can be no estoppel based upon acts or conduct of the party sought to be estopped, where such conduct is as consistent with honest purpose or with an absence of negligence, as with their opposites.

We do not find, therefore, any misrepresentation that could be attributed to the appellee, either by express statement or by silence under circumstances when he should have spoken. Representations made by the managing directors and principal owners of the old company, even though they were more explicit than they are proved to have been, in his absence or without his certain specific knowledge, could not create an estoppel in favor of the new company as against him. If the appellee is estopped at all to assert his title to the patent issued to him, it must be by acts and conduct prior to the consolidation and conveyance to the new company, of December 31, 1899. Whether the officers of the new company thought, or had reason to think, from the representations of the principal owners and directors of the old company, that the patent in suit passed to the new company by the general conveyance of the old company's property to it, is not material or relevant. If deceived or disappointed by these representations, their remedy is against the old company.

What occurred between Arrott, Jr., and the new company after the consolidation, can have a bearing only upon the asserted special contract between them. This special contract, as we have seen, was the gravamen of the defense to the suit for infringement, and the basis for the title set up in the bill for specific performance, and we have indicated our agreement with the learned judge of the

court below, in his finding of fact that no such contract existed. We do not find, however, that there is any evidence of conduct on the part of Arrott, Jr., after the consolidation, as is contended by the appellant, that is inconsistent with the assertion of his title to the patent in suit. We have seen in his letter of the 17th of January, to Mr. Dawes, one of the directors of the new company, as also in his letter of the 26th of January to his father, communicated to Mr. Aherns, and from his own testimony, that he emphatically, by writing and speech, asserted his ownership of the patent, and denied the right of the old company to transfer the same to the new.

Appellants contend that, whatever may be the conclusion as to their right to a conveyance of the title to the patent, or of their equitable ownership therein, there was an implied irrevocable license in the old company to use the device of the said patent, resulting from the facts and circumstances attending the making and perfection of the invention, the issuance of the patent therefor, and the relations existing between the old company and the appellee as a stockholder and officer thereof. No issue of license, irrevocable or otherwise, was raised by the pleadings in either case. In both the infringement suit and the bill for specific performance, the case of appellant was put, as we have seen, distinctly upon one ground, and that was the alleged equitable ownership of the patent, and upon that issue complainant and defendant went to proofs and to hearing. But the question thus mooted could not under any circumstances be determined in favor of the appellant. The evidence is undisputed of the contract of October 23, 1899, by which it was agreed that the old company recognized the title of the appellee to his patent, and would pay a satisfactory royalty to him for a license to use the same. No implied contract of license, arising from the circumstances under which the patent was taken out and the relations of the parties, can be set up in the face of a proved special contract of license. The contract, evidenced by the minute of October 23d, fixed the relations of the parties, and absolutely removes all ground upon which the implication of a license could be raised. The reciprocal rights and obligations of the old company and of the appellee, with reference to the patent in suit, have been established by this voluntary contractual act. The license so granted is personal in its nature, and unassignable, no intent being shown in the contract that it should be otherwise. The appellants have apparently recognized this, as well as the unassignability of an implied contract, and instead of proceeding to make a satisfactory arrangement for themselves with the appellee for the use of his patent, have endeavored, both in the infringement suit and in the bill for specific performance, to set up an equitable title, which they no doubt honestly believed they had derived from the old company.

The decrees of the court below in both cases are affirmed.