STANDARD SANITARY MFG. CO. v. J. L. MOTT IRON WORKS.

(Circuit Court, D. New Jersey. April 8, 1907.)

1. PATENTS—PRIOR USE—EVIDENCE TO ESTABLISH.
Evidence considered, and *held* insufficient to establish prior invention of a patented device, in the absence of the testimony of the alleged inventor, or any showing that it could not be obtained, and where the device itself was not produced, and appeared from the testimony to have been at most an abandoned experiment.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 104.
Priority and continuance of public use of invention as affecting patentability, see note to Eastman v. City of New York, 69 C. C. A. 646.]

2. SAME—VALIDITY AND INFRINGEMENT—DREDGER FOR ENAMELING.
The Arrott patent, No. 633,941, for a dredger for pulverulent material, used in the enameling of bath tubs, having a pneumatic agitator contained in the hollow handle, adapted to vibrate the sieve to secure a uniform distribution of the material, was not anticipated and discloses patentable invention; also *held* valid as against a claim of prior use, and infringed.

In Equity. On final hearing.

George R. Beach and Christy & Christy (Marshall A. Christy and George H. Christy, of counsel), for complainant.
W. P. Preble, Jr., for defendant.

CROSS, District Judge. The bill of complaint charges the defendant with infringing a patent issued to one James W. Arrott, Jr., dated September 26, 1899, known as No. 633,941, and which by assignment subsequently became, and is now, the property of the complainant. The device covered by the patent is a "dredger for pulverulent material," and the patentee, in describing it, says:

"This invention has relation to articles used for sifting and distributing powdered enameling material on the surface of bath tubs and other vessels, commonly known to the trade as 'dredgers.'"

The answer sets up the invalidity of the patent for want of novelty and invention, and also denies infringement.

There are three claims in the patent, all of which it is contended have been infringed. They are as follows:

"(1) A dredger or sifter, consisting of a screen or sieve and a supporting handle, in combination with a pneumatic agitator attached to the dredger and adapted to vibrate the sieve, substantially as described.

"(2) A dredger or sifter, consisting of a sieve and a handle, in combination with an automatic agitator secured to and carried by the dredger and adapted to agitate or vibrate the same, substantially as described.

"(3) A dredger or sifter, comprising a sieve and handle and an automatic agitator secured thereto, with means for controlling the operation of said agitator, substantially as described."

This patent was before the Circuit Court for the Western District of Pennsylvania, in cross-suits between the patentee and the present complainant, and was therein adjudged to be good and valid in law. It appears from the opinion of Judge Acheson that an alleged prior use of the patented article was considered by him and disallowed. However, he states that the patentability of the improvement was not denied. Arrott v. Standard Sanitary Mfg. Co. (C. C.) 131 Fed. 457.

The decrees entered in those suits were subsequently affirmed by the Circuit Court of Appeals for the Third Circuit. 135 Fed. 750, 68 C. C. A. 388.

As already indicated, the dredger is used for distributing powdered enamel over cast-iron sanitary ware, while the ware is heated to a red heat. The process may be briefly described as follows: After the casting has been prepared for the enameling, a first coat, commonly called "slush or base," is applied to the article in liquid form. After this coating has dried, the article is placed in the enameling furnace until the same is burned or fused into the iron, and the casting itself has been raised to a bright red heat. When thus heated, the article, generally a bath tub, is withdrawn from the furnace and placed in a holder or cradle resting upon a table, and the powdered enamel dusted by a dredger over the hot surface of the tub as evenly as possible, until the tub has cooled to such a degree that it will not readily hold the enamel, whereupon it is reheated, whereby the enamel deposited thereon is fused into a uniform homogeneous layer. The reheated tub is then withdrawn from the furnace and given a second coat of the powdered enamel, and this operation is repeated as often as is necessary to obtain a smooth and even coating of the enamel. While the casting is resting upon the holder or cradle, it is turned from time to time in different directions and at different angles, in order that the powdered enamel may fall as nearly as may be at right angles to that portion of the surface upon which it is then being distributed. The enamel as used is an extremely fine powder, like ordinary flour in that respect, although considerably heavier. In order that the enameling operation should be completely successful, the powder must be distributed evenly and uniformly over the surface of the tub, and it must be applied as speedily as possible, since the powder will not adhere to the casting when its temperature is lowered beyond a certain degree. Unless the enamel has been evenly distributed over the article, its surface, when finished, will have a lumpy or wavy appearance, which, if glaring, renders the article worthless, and, if barely apparent, makes it what is called a "second"; and an article of that grade is of considerably diminished value. In order to produce an even coating of the enamel, there must be uniformity and continuity in the flow of the powdered enamel, and under these conditions all that the operator has to do, to insure success, is to move the dredger over the surface to be covered at a uniform rate of movement. On the contrary, when the flow of the enamel from the dredger is not uniform or continuous, an even distribution of the enamel is rendered much more difficult, if not impossible.

The condition of the prior art and the object which the inventor by his patent sought to attain will be stated in his own language:

"The ordinary dredger consists simply of a sieve or other screen of proper mesh having a handle of convenient length by which it is held and manipulated. As the pulverulent material does not freely pass through the sieve or evenly distribute itself spontaneously, it is necessary in dredging to continually agitate the dredger with the hand, or with some instrument held in the hand, by tapping or striking the dredger, or by striking the dredger against the edge of the article to be enameled. This renders the labor of dredging or sifting very tiresome and slow, and requires considerable skill in manipulating

the dredger so as to insure an even delivery of the enameling material. The object of this invention is to provide an automatic tapper or agitator, which will deliver a succession of rapid blows against the side or end of the dredger, and, while relieving the workman of a great deal of labor, causes the pulverulent material or powder to be evenly distributed and to be uniformly discharged. The device which I employ for this purpose is preferably a pneumatic hammer, the piston or plunger of which is elongated and .fitted to the hollow handle of the dredger, so as to reciprocate within the latter and strike the end or side of the dredger with every forward stroke."

The hand dredger of the prior art consisted of an ordinary tin cup or measure, holding 10 or 12 pounds of the powdered enamel, and having a fine-meshed sieve bottom, a wooden handle 4 or 5 feet long attached to the cup or measure, and a detached beater. The handle of the dredger was ordinarily grasped by the workman with his left hand, the end of the handle projecting back under his elbow for support, and while the dredger was thus supported it was moved around over the surface of the article to be enameled and its handle constantly beaten above and below by a beater held and operated by the right hand of the workman. This was obviously a somewhat crude and certainly a laborious operation, and it was necessarily performed in immediate proximity to a red-hot tub. Speaking of the labor involved in the use of a hand-tapped dredger, complainant's manager says:

"The operation of handling a hand-tapping dredger is not only difficult, but laborious, and before a man could become expert in his work he was compelled to master the knack of depositing the enamel evenly upon the surface of the casting. It was always necessary to not only have a man of good judgment, but a man of physical strength. The constant tapping, and standing in front of a hot casting at the same time, was very exhausting. During .the summer months it was almost an impossibility to keep the furnaces fully manned, by reason of the men becoming exhausted at their work, largely on account of the labor connected with the applying of the enamel to the casting."

Another witness, a practical enameler says:

"This operation of holding the dredger with one hand and rapping with the other was very hard labor. Continuous rapping with one hand for a certain length of time cramped your arm, so that you could not rap any further or proceed with enameling."

The disadvantages and labor of this method were so apparent that the complainant's witnesses testify that considerable effort had been made to overcome them. By the pneumatic method of the patent in suit what was before laborious, slow, and uncertain has been rendered comparatively easy, rapid, and successful. The testimony shows that the operation of enameling bath tubs under this patent has been so accelerated that, whereas, by the hand beater a workman could enamel but a single tub an hour, he can now enamel from $2\frac{1}{2}$ to 4 tubs an hour. The pneumatic hammer strikes several thousand graded and uniform taps a minute, and the blows are communicated by a rod from the hammer through the hollow handle of the dredger to the sieve bottom of the vessel holding the enamel, without agitating to any appreciable extent the handle itself, thus maintaining an even and constant flow of the powder. In its use the workman has both hands free to support the dredger, and can move it quietly and quickly over the article being enameled, without any disturbing jar from the motion of his arm in

striking or from the blows struck by him, which was unavoidable under the old method. The testimony clearly shows that by the pneumatic method the powdered enamel flows evenly and continuously from its receptacle, while by the hand method it is discharged in varying volume by intermittent puffs.

It seems to me that the prior art requires very little attention. It is true that pneumatic hammers were used for certain purposes prior to the complainant's patent, but they were not used in the art under consideration, or, indeed, in any analogous art. The Boyer patent, No. 575,589, is one of this class, but is so far removed from the patent under discussion as not to require serious consideration. Hammers of that character were used for heading rivets, cutting stone, and work of like character. The Hyde patent, No. 91,849, is for a pneumatic dental plugger, and of this nothing more need be said. The Babbitt patent, No. 454,149, is used for embossing work in sheet metal. Many other patents are cited, but the idea of the patent in suit is entirely foreign to each of them. They were mostly designed for screening sand, coal, ashes, grain, bran, and other like materials. Their purpose was to separate larger particles from smaller, and in their operation the screen moves speedily back and forth, or peripherally, and the substance screened is by its own weight caused to slide back and forth over the surface of the screen, whereby the finer particles are dropped through, and the coarser are retained or distributed apart from the finer. There is nothing in any of them which would be at all likely to suggest what Arrott accomplished. They are in a different art, of different construction, and used for entirely different purposes. His idea was the use of a pneumatic or automatic agitator, attached to the dredger and adapted to vibrate the sieve through a hollow handle. As already stated, all of the appliances known to the art prior to his patent were hand vibrators of some sort. None of them approximated or claimed to approximate what Arrott did, and their consideration would be unprofitable. It is true all of the elements in his patent are old, but they are combined in a new way to produce a new and useful result. By it the hand beater has been eliminated, and with it, to a great extent, the personal equation. His invention is useful, successful, and economical, and in my judgment discloses novelty and invention. Although simple, it was not obvious.

The defendant, however, alleges that the patent is invalid because of the prior use of an unpatented pneumatic device of a like character to accomplish the same purpose. In support of this contention considerable evidence has been produced, from which it appears that a few bath tubs were enameled with some degree of success by the defendant in the fall of 1896 by a device in some respects similar to that defined in the complainant's patent; but I think that the evidence, considered as a whole, discloses nothing more than an abandoned experiment. The device—there was but one—was in operation, so the workmen who used it say, off and on for about a week or ten days, although one or two other witnesses intimate that it was used for a somewhat longer period. It was then unquestionably dismantled, and was not again used; nor was anything like it used for several years afterwards, and not until after the defendant had removed its works

from Mott Haven, N. Y., to Trenton, N. J. In attempting to describe the apparatus, two of the witnesses say that the pneumatic hammer was placed under the outer end of the handle; one that it was at the sieve end, right up against the sieve; and still another that it was at about the middle of the length of the handle and on top thereof. The uncertainties and discrepancies of their testimony are apparent, and can only be reconciled upon the theory that the hammer was being changed hourly or daily from one position to another, which tends strongly to show that the device was purely experimental. Furthermore, it probably was a failure. It certainly was used but a very short time, and was then abandoned. The superintendent of the defendant gives, as a reason for such abandonment, insufficiency of the boiler capacity of the plant to furnish the requisite power over and above what was required for other purposes; and, being asked what the boiler capacity of the plant was, he said that it was 60 horse power. The engineer of the defendant, however, being asked the same question, said that it was 120 horse power. This would seem to dispose of the reason for abandonment alleged by the superintendent. The only other reason for its abandonment, and this by a different witness, was that the alleged inventor left the defendant's factory and employment. This reason is as improbable as the other, since the testimony shows that the device, whatever it was, was used in November, 1896; whereas, its inventor did not leave the factory until May 11, 1897. Furthermore workmen who used the device say that they made more money by the old way of enameling; that the new method was not fast enough; that they used it because they were ordered to; that it did not distribute the enamel any better or any faster, nor was it any easier to move around over the tub; and that the old hand method of Lefferts' patent dredger did just as good work and was just as easy to handle.

The alleged device was not produced, nor was any part of it, unless it be the pneumatic hammer. While the testimony was being taken, the workmen who mainly used the device were shown a pneumatic hammer which they said they recognized as the one used in November, 1896. One of them, when asked how he identified it, answered, "By its make-up, and where the rod enters, and size of valve used for the air to let the air into the tool"; and the other unhesitatingly recognized it by its number, which was "3817 C. C." The first witness does not pretend that the characteristics which he describes, and by which he claimed to identify the hammer, were in any wise peculiar to that particular hammer; while the second, who admitted that he made no memorandum of the number, nevertheless claimed to remember it by its number after the lapse of 10 years. The prodigious feat of memory involved in this identification is apparent and requires no comment. To my mind, however, it trenches so far on the improbable as to greatly affect the credibility of the testimony.

There is one other matter in this connection which requires mention. The man who is alleged to have invented the pneumatic dredger used by the defendant in 1896 was one Harry Lefferts. His father, Leffert Lefferts, was a witness in the case. He was formerly, and for about 25 years, a superintendent of the defendant's plant, but left the com-

pany's employment in May, 1896. His testimony in this case was given last October, and, upon being asked the present address of his son, replied:

"I have received no communication from him for the last seven or eight months. Do not know where he is at present, but suppose that he is at his old address, at No. 8 Gould street, San Francisco."

And upon cross-examination he added that when he last heard from him he was in the employment of the Southern Pacific Construction Company. He of all others was apparently the one who could have told the most about the construction and operation of the device alleged to have been in use in 1896. He was the superintendent of the defendant's enameling department at the time, and the alleged inventor of the device. He is not produced, however, nor is any evidence offered to show that he could not have been. His absence is entirely unaccounted for, although his address was presumably known. I think this circumstance very strongly militates against the defense of prior use. In the case of Simmons et al. v. Standard Oil Co. et al. (C. C.) 62 Fed. 928, Judge Coxe, at page 930, commenting upon the absence of a witness under somewhat similar circumstances, said:

"The complainants have introduced a mass of testimony to show that Glankler conceived the invention in the autumn of 1888, months prior to the alleged use at Cincinnati and Chicago. This testimony, notwithstanding numerous contradictions and discrepancies, is upon the whole so full and circumstantial that it would be accepted as conclusive, were it not for the fact that Glankler himself failed to appear as a witness. No sufficient reason is given for his nonappearance. It was apparently without excuse, and leaves room to doubt the accuracy of the complainant's dates and the correctness of their conclusions. No matter from what point of view the question is approached, there is always the suspicion that, if Glankler could have corroborated this testimony, he would have done so."

In the present case Lefferts' testimony was so important, and its unexplained absence so suspicious, that I think Judge Coxe's remarks are eminently pertinent and applicable. If the witness could not have been found, that fact could have been easily shown; but, if found, his testimony would in all probability have been more illuminative of the point under consideration than the combined testimony of all the other witnesses. His absence, unaccounted for, is suspicious, and opens the entire defense of prior use to suspicion. The rule of law applicable to the defense of prior use is well settled and renders any extensive citation of authorities unnecessary. It may be found laid down in Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821, and the Barbed Wire Patent Case, 143 U. S. 275, 285, 12 Sup. Ct. 443, 36 L. Ed. 154. In the case at bar the testimony is unsupported by any patents, drawings, or exhibits, and a case thus made is always open to grave suspicion. In Deering v. Winona Harvester Works, 155 U. S. 286, 300, 15 Sup. Ct. 118, 39 L. Ed. 153, Mr. Justice Brown says:

"Oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented, is in the nature of the case open to grave suspicion."

He then cites the Barbed Wire Patent Case, and adds considerable matter pertinent to the case at bar, but which it is unnecessary to quote.

I think the prior use which has been set up as a defense, was experimental, as, indeed, some of the defendant's witnesses called it, and the general superintendent of the defendant's plant, near the close of his testimony plainly admits that, after the workmen who used the machine had abandoned its use, Lefferts, its inventor, was still working at it.

There is one other circumstance in this connection which should be alluded to. After the abandonment by the defendant of the single article used in the fall of 1896, it does not pretend that it again used a pneumatic dredger until about December 1, 1905. Shortly prior to this latter date, it had bought several thousand of enameled bath tubs of the complainant, and in the course of these transactions its superintendent frequently visited the complainant's works, and had ample opportunity to, and did in fact, as he admits, observe the operations of their plant, and became "very familiar" with the operation of their pneumatic dredger, although this, as he says, was not the object of his visits. Not long thereafter, however, the defendant adopted and put into general use in its factory the alleged infringing devices.

Upon the question of infringement there is little to be said. The defendant has adopted the complainant's device and used it. In its use, however, it partially supports the weight of the pneumatic dredger by a chain attached to and suspended from the ceiling of the factory. This, perhaps, makes it easier for the operator, but does not in any way alter the character of the device or its method of operation. The defendant claims, however, that this support by a chain affixed to the ceiling makes the device stationary, and that, since Arrott, the patentee of complainant's device, disclaimed its application to stationary apparatus, the defendant does not infringe. What the patentee said, and all that he said, in this connection, was:

"I am aware that jarring or vibrating devices have been used in stationary apparatus used for sifting material."

It is quite evident to what he there refers. That the defendant's infringing device was not a stationary apparatus, within the terms of this disclaimer, is apparent. The dredger was merely supported, or partially supported, by a cord or rope, to take some of its weight from the workmen. It was not, however, stationary in any proper sense of the word. It was movable, and had, while in use, to be moved constantly back and forth over the ware which was being enameled, exactly as it would have been if unsupported. This support was of the same character as that afforded by a strap over the neck or shoulder of the operator, as disclosed in the hand-beater dredger in the prior art.

The complainant is entitled to a decree of the usual form in like cases, with costs.