## VICTOR TALKING MACHINE CO. v. AMERICAN GRAPHOPHONE CO.

(Circuit Court, S. D. New York. March 27, 1911.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—RECORD FOR TALKING MACHINES.

The Johnson patent, No. 896,059, for a record for talking machines and method of making the same, which consists of a laterally undulating record of constant depth in which the groove is formed by cutting out and removing the material of the disk by a cutting tool instead of being displaced by a needle point tool, and in which the side walls of the groove are clearly defined and smooth surfaces, and in the preferred form diverge from the bottom to the surface of the record, was properly granted in the discretion of the Patent Office on a divisional application, and was not anticipated by the Jones patent, No. 688,739, and discloses invention; also held infringed.

2. PATENTS (§ 229*)—SUIT FOR INFRINGEMENT—DEFENSES—ESTOPPEL.

A patent for a process consisting of a number of steps may be valid, although each of the steps was old, and a decree finding infringement of such a patent does not estop the defendant from claiming a valid patent himself for one of such steps, nor from maintaining a suit against the complainant for its infringement.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 229.*]

3. JUDGMENT (§ 701*)—PERSONS CONCLUDED—STOCKHOLDER IN CORPORATION DEFENDANT.

A stockholder in a corporation which is sued for infringement of a patent, although owning a majority of its stock, has not the legal right to control the defense in such suit, nor to intervene and make a separate

---

defense, and is not bound individually as a party or privy by the decree therein, where he does not in fact assume such defense.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1226; Dec. Dig. § 701.*]

4. PATENTS (§ 129*)—VALIDITY—ESTOPPEL TO DENY—LICENSEE.

A licensee under a patent is not estopped to purchase a valid patent subsequently issued to another on an application pending when the prior patent was issued, and which, if asserted, shows the prior patent under which the license was taken to have been invalid for anticipation, nor to assert his patent by suit against all infringers including his licensee.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 182½–186; Dec. Dig. § 129.*]

5. ESTOPPEL (§ 118*)—EQUITABLE ESTOPPEL—PROOF OF FRAUD.

In the absence of expressly proved fraud, there can be no estoppel based on the acts and conduct of the party sought to be estopped, where such acts and conduct are as consistent with honest purpose and absence of negligence, as with their opposites, and the facts constituting the estoppel must be clearly and distinctly and satisfactorily proved.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 306, 308; Dec. Dig. § 118.*]

In Equity. Suit by the Victor Talking Machine Company against the American Graphophone Company. Decree for complainant.

Suit in equity to restrain alleged infringement of United States letters patent No. 896,059, dated August 11, 1908, "record for talking machine," and for an accounting.

Horace Pettit, for complainant.

Philip Mauro, Reeve Lewis, and C. A. L. Massie (Ralph L. Scott, of counsel), for defendant.

RAY, District Judge. [1] The patent in suit, "record for talking machines," was granted to Eldridge R. Johnson, assignor to Victor Machine Company, August 11, 1908, on divisional application filed November 12, 1904, original application filed August 16, 1898. While the complainant alleges in a general way that substantially all the claims are infringed, it points out and specifically alleges infringement of claims 2, 3, 4, 8, 14, and 23. These claims read as follows:

"2. A disk sound record, having a cut laterally undulatory groove of substantially constant depth, the walls of said groove diverging from the bottom of the same to the surface of the record.

"3. The method of producing sound records consisting in cutting as distinguished from marking or tracing upon a tablet of suitable material by means of the lateral vibrations of a suitable stylus a record groove of appreciable and substantially uniform depth having lateral undulations corresponding to the sound waves.

"4. A sound record made from a cut laterally undulatory groove of substantially constant depth, the walls of said groove diverging from the bottom of the same to the surface of the record tablet. * * *

"8. A disk sound record comprising a spirally disposed laterally undulatory groove of substantially constant depth in which the record groove was formed by cutting out and removing the material in forming the record groove, substantially as described. * * *

"14. In the art of recording and reproducing sounds, the method of cutting out a laterally undulatory groove of substantially constant depth in a tablet of suitable material by vibrating laterally a cutting stylus

through the medium of sound waves and then forming a duplicate there-
of.  *  *  *

"23. The method of producing sound records consisting in cutting out
the material in forming the record groove as distinguished from mark-
ing or tracing, upon a tablet of wax or other suitable material by means
of the lateral vibrations of a suitable cutting stylus, and forming a record
groove of appreciable and substantially uniform depth having lateral
undulations corresponding to the sound waves, and then reproducing a
sound record from the original record groove so cut."

## The specifications of the patent in suit say:

"My invention relates to improvements in sound records of either the
cylindrical or disk type, and has for its object to provide an improved
record such that the walls of the groove shall be so formed as to reproduce
the sounds of the record in tones more clear and distinct than has here-
tofore been possible from records of prior construction.

"In forming records upon sound recording machines for use in talking
machines, such as the gramophone, where the sound waves are recorded
in the form of a groove of even depth having lateral undulations as dis-
tinguished from an undulatory groove of varying depth, as in the type of
machines of which the phonograph is an illustration, it is essential, in order
to produce a clear record, that the material be neatly and cleanly cut
from the grooves in the process of recording so that smooth, well-defined
surfaces be formed in the walls of a well defined groove.

"In the art of making sound records, comparatively little attention has
been paid to the finishing and the forming of the surfaces of the walls of
the record groove.  The vertical groove has heretofore been cut by a re-
cording tool, which, owing to the character of the groove and the shape
of the tool, has not only had a tendency to tear the material of the
record, or distort the same, so as to form roughnesses which, in the
reproduction of the record or its duplicate, cause disagreeable sounds,
owing to the harsh vibrations of the diaphragm caused thereby, but also,
among other things, in the vertical type of record, the resistance on the
cutting stylus in gouging out the material increases in proportion to the
depth, which objection is overcome in my cut laterally undulating record
groove, where the resistance to the force exerted by the cutting stylus is
uniform and even.

"I have discovered by careful experiments that the best results are ob-
tained in a cut out laterally undulatory groove of substantially constant,
depth in a record tablet, preferably of wax or other suitable material, and
furthermore, when the walls of the groove diverge from the bottom of the
same to the surface of the record, or, more specifically, when the walls of
the groove are formed by surfaces which in cross section give the lines
of a segment of an ellipse, the groove being widest at its mouth, and
gradually diminishing in its width toward the bottom.  By this construc-
tion, the material is neatly and accurately cut out, and forms a groove
having smooth and well-defined walls; the recording needle has greater
freedom of oscillation, and by reason of the relative contour of the walls
of the groove with the outline of the needle, this construction prevents any
binding effect and secures a maximum ease of movement of the needle with
a minimum of wear upon the record."

## Mr. R. M. Hunter, complainant's expert, says:

"(8) I understand that the broad invention comprehended by the paten-
tee is embodied in the method of producing a laterally undulating record
of constant depth when the groove is formed by cutting out and removing
the material, and in which the side walls of the groove are clearly defined
and smooth surfaces produced by the cutting or engraving action of the
stylus during the formation of the cut-out groove, whereas in the pre-

ferred form of the invention the side walls of the groove 'diverge from the bottom of the same to the surface of the record.'

"(9) The invention described in the patent embodies a method of forming an engraved or cut-out record and also the making of a commercial record from the cut-out record; also the structure comprising a disc having a cut-out laterally undulatory groove with or without diverging side walls; and, finally, a sound record made from the cut-out laterally undulatory groove of constant depth, and which sound record preferably is provided with diverging side walls. The first of these improvements is defined in claims 3, 14, and 23 of the patent in suit, the second is comprised in claims 2 and 8 thereof, and the third is comprised in claim 4 thereof."

In what is called the parent patent, patent to Eldridge R. Johnson, assignor to Victor Talking Machine Company, No. 778,975, dated January 3, 1905, application filed August 16, 1898, the claim made was for "cutting-tool for sound-recording machines." Johnson tells how to make or form a cut-out record. He says, after telling how to cut out and form a record:

"It is understood that in reproducing the record thus formed may be used for reproducing purposes directly, or a more durable and indestructable record may be reproduced by various processes from the original record. This feature, however, forms no part of my present invention herein described."

Earlier in the specifications of such parent patent, No. 778,975, he said:

"In producing records upon sound-recording machines for use upon talking-machines, such as the gramophones, where the sound-waves are recorded in the sides of the groove in the record instead of in the base, as in the type of machine of which the phonograph is an illustration, it is essential in order to produce a clear record that the material be cleanly and neatly cut from the groove in the process of recording, so that sharp well-defined lines will be formed in the walls of the groove. I have discovered that, in order to produce the best results, these side walls of the groove must be at a slight angle to the face of the plate or record, and the groove must be widest at the mouth. Where the walls are perpendicular or slightly wider at a point below the mouth of the groove, inferior results are produced, and the record is by no means as durable.

"The object of my present invention is to provide a cutting tool for cutting grooves in wax or other suitable material for recording sound waves of the construction above referred to, my aim being to provide a tool of microscopic proportions peculiarly formed with a flat face of substantially oval form, the edges of the oval being cutting edges to cleanly cut the material from the resultant groove, leaving sharp, smooth, well-defined edges, the flat face being preferably obliquely disposed to the axial line of the tool, so that when in position in operation to present a cutting-face substantially perpendicular.

"It is clear that my invention may also be applicable to other constructions of recording machines than that hereinbefore more particularly referred to."

Having said this, Johnson then described the tool for doing the work, how to use it, the method of doing the work, and the result. It is seen, however, that the record and method claims were not filed until November 12, 1904, six years after the filing of the "parent patent." I do not think there was an abuse of discretion in the Patent Office in allowing a division of the application in this case. In Stein-

metz v. Allen, 192 U. S. 543, 24 Sup. Ct. 416, 48 L. Ed. 555, the court, speaking of the division of applications, said:

"Without that rule (rule 41 held to be a hard and fast rule), the action of the Patent Office can be accommodated to the character of inventions and discretion can be exercised, and, when exercised, we may say in passing, except in cases of clear abuse, the courts will not review it."

## Jones Patent.

November 19, 1897, Joseph W. Jones filed an application for a patent in this same art, and which the defendant claims, fully covered this same invention described in the Johnson patent in suit and a patent issued thereon on the 10th day of December, 1901, for "production of sound records," No. 688,739. That patent has been the subject of considerable litigation. See American Graphophone Co. v. Leeds & C. Co. (C. C.) 131 Fed. 281; Id. (C. C.) 140 Fed. 981; Same v. Universal Talking Machine Co. (C. C.) 145 Fed. 636; Same v. American Record Co. (C. C.) 145 Fed. 643; Same v. Universal Talking Machine Co., 151 Fed. 595, 81 C. C. A. 139; Same v. International Record Co. (C. C.) 155 Fed. 427; Same v. Leeds & C. Co., 170 Fed. 327, 95 C. C. A. 511.

It is important to know what Jones invented when he made his invention and what he covers by his claims, and it is also important to know when Johnson made his invention described both in the so-called parent patent and the patent in suit. Jones antedates Johnson's first application by about nine months. The claims of the Jones patent read as follows:

"1. The herein-described method of producing sound records, which consist in cutting or engraving upon a tablet of suitable material, by means of the lateral vibrations of a suitable stylus, a record-groove of appreciable and practically uniform depth and having lateral undulations corresponding to the sound waves, next coating the same with a conducting material, then forming a matrix thereon by electrolysis, and finally separating this matrix and pressing the same into a tablet of suitable material, substantially as described.

"2. The process of producing commercial sound records of the type indicated, which consists of first preparing a flat tablet or disk of soft wax-like material, then engraving thereon by means of the lateral vibrations of a suitable stylus a record-groove of appreciable and uniform depth and having lateral undulations corresponding to sound-waves, next rendering the surface thereof electrically conductive, then forming a matrix thereon by electrolysis, next separating the matrix from the original record disk without the use of heat, and finally impressing said matrix into a disk of suitable material to form the ultimate record, substantially as described."

In his specifications Jones says:

"My invention relates to the commercial production of sound records, and has for its object the production of a number of copies of an original record characterized by lateral undulations of substantially uniform depth."

He then points out the so-called etching process of the prior art, and then says:

"I avoid these objections by producing in the first instance a fully-finished original record whose grooves are of the final depth required, slight but appreciable, thus doing away with the necessity for etching and the subsequent smoothing made necessary thereby. The original records

made by this process are electroplated and the electroplate matrix used as a die in the ordinary manner.

"In carrying out my invention, I employ a disk or tablet, of suitable recording material (as wax or a wax-like composition, preferably rendered sufficiently hard, as by an admixture of rosin, to withstand the treatment employed in giving it an electrical conducting-surface). Upon the surface of this tablet I then form by the use of a sound-recording machine in a well-known manner a spiral groove of practically uniform depth that contains lateral sinuosities or irregularities corresponding to or representing the sound waves recorded. This cutting or engraving of a record groove by the lateral movement of the stylus differs from the operation of the well-known graphophone system in that the resistance offered the stylus of a graphophone in cutting downward to produce the vertical irregularities characteristic of that system varies practically as the cube of the length of the vibrations of the diaphragm and stylus, whereas in producing my original records the resistance encountered by my recording-stylus is exactly equal to the length of the vibrations. On account of this difference in principle I am enabled to obtain more accurate, and therefore better, records of the original sounds. The original record so formed is an exact copy of the record to be used for reproducing. It is a complete and finished record, its grooves being of a slight yet appreciable depth, and no deepening or retouching by an etching fluid or in any other manner is required."

He then points out his electroplate process for the commercial production of sound records:

"I am aware that it has been proposed to make duplicates of sound records of the vertically-undulated character, the type generally known as 'graphophone-records,' by first coating the surface of such sound record with a conducting material, next depositing an electroplate thereon to form a die, and then pressing this die into some suitable material. This process is impracticable and unsuccessful for two reasons. First, when the conducting material (as plumbago) is deposited upon the vertical irregularities that are the very essence of this kind of record it forms a covering that resembles on a minute scale a light fall of snow over a landscape. The sharp contours of the vertical irregularities are rounded (the more delicate and minute irregularities being filled in and completely obliterated), with a resulting mutilation of the record. Again, when the electroplate die is pressed into the surface to be stamped any inequality in the material being stamped would cause unequal impressions to be made, some deeper than others, which is fatal to the accuracy of a record, whose very existence lies in the comparative depths and heights (vertical) of the irregularities. Furthermore, the presence (between the die and the material being stamped) of minute particles of dust or other foreign matter, or even of particles of air (air bubbles), would to that extent still further distort and disfigure the impressions stamped by an already inaccurate die, whereas in the laterally-undulated records any vertical deformation (whether due to the causes just pointed out or to any other cause) does not in the slightest degree affect the accuracy of the record, the essence of which lies in its lateral undulations, for the deposit of a film of conducting material does not modify the lateral outline, but only the vertical irregularities, and the deformations caused by the presence of foreign particles in the stamping or pressing process are vertical, and consequently do not affect a record that depends upon its lateral and not its vertical outline."

He then concludes his specifications as follows:

"For the foregoing reasons I do not claim my new process in connection with sound records characterized by vertical irregularities, but limit it to records characterized by lateral undulations of practically uniform depth."

It is obvious from the specifications of the Jones patent that he did not claim the discovery or use of any new or improved mode or method of "cutting or engraving" the spiral grooves, the laterally undulating grooves, in the wax or wax like tablet. He plainly recognized that this had been done before, and that there was more than one way of doing it. After describing his disk or tablet of suitable recording material, he specifically says:

"Upon the surface of this tablet I then form by the use of a sound-recording machine in a well-known manner a spiral groove of practically uniform depth that contains lateral sinuosities or irregularities corresponding to or representing the sound-waves recorded."

In short, he cuts or engraves his spiral groove in "a well-known manner."

In American Graphophone Company v. Universal Talking Machine Company, 151 Fed. 595, 81 C. C. A. 139, the Circuit Court of Appeals in this, the Second circuit, Judge Townsend writing the opinion, upheld the validity of the Jones patent as disclosing invention in the mode or method of making commercial sound records by (1) cutting or engraving a record groove of uniform depth by means of the lateral vibrations of a suitable stylus upon a disk of wax like material; (2) coating the same with a conducting material; (3) then forming a matrix thereon by electrolysis; (4) then making therefrom duplicate records by impression. This case was decided January 14, 1907. I find no reference in that case to the then pending application of Johnson for the patent in suit, issued in August of the next year, 1908. Judge Townsend refers to the Bell and Tainter patent, No. 341,214, claim 9 of which was for "the method of forming a sound or speech record which consists in engraving or cutting the same in wax or a wax like composition, substantially as described." Of this Judge Townsend said:

"An examination of the Bell and Tainter patent shows that the assumptions as to its broad scope are without foundation. There is not a word of reference in the specifications to the engraving laterally of undulating records, or of any records of uniform depth."

This indicates a departure by Jones from Bell and Tainter in both these respects, as, indeed, the specifications and claims of Jones show. Clearly Jones cut or engraved on his tablet a record-groove "of appreciable and practically uniform depth" having "lateral undulations corresponding to the sound waves." From the opinion of Judge Townsend we would infer that it was here that he found patentable invention in the Jones method. The distinction drawn between Bell and Tainter and Jones seems to have been that Bell and Tainter cut or engraved sound grooves on cylinders or on tablets vertically instead of laterally and without regard to uniformity in depth.

### Patent Office.

After Johnson had divided his original application and filed his application for the patent in suit, November 12, 1904 (serial No. 232,389), the principal examiner finally April 3, 1908, rejected claims 1, 2, 3, and 9 (which seem to be the same as claims 1, 2, 3, and 4 of

the patent in suit), and the claimant appealed to the board of examiners in chief April 8, 1908. Amongst others the Jones patent in question here was cited. July 7, 1908, the board of examiners reversed the examiner in chief. It was held that Johnson was rightfully in the Patent Office with his divisional claims, and that Jones did not anticipate as he had filed and abandoned claims for the same subject-matter as is embraced in the claims before the board of the patent in suit. Amongst other things on this subject the board said:

"Jones has no more equity against the applicant's right to a patent for the subject-matter of the appealed claims, nor, if possible, even as much as Clark and Johnson, No. 624,625, May 9, 1899, have, upon whose patent Jones claims for the subject matter here appealed were rejected."

## The board of examiners also said:

"It will be observed from the foregoing that the application discloses and claims a method of producing a sound record by cutting out the grooves, or by 'cutting' as it is named in claim 3, and a sound record in which the grooves are 'cut' or cut out. The claims will be treated in this decision as if they read cutting out and cut out, as an examination of the application reveals that the terms 'cutting' and 'cut' mean, respectively, cutting out and cut out.

"The prior state of the art of record shows that a 'cut' groove with diverging walls was old prior to August 16, 1898 (Bell & Tainter), and that a 'tracer' laterally undulatory groove of substantially constant depth, the walls diverging from the bottom of the groove to the surface of the record, was old (British patent No. 15,206). This latter statement is based on the holding that the pointed tracer—having walls sloping to a point—in the British patent will cause a groove to be formed with sloping or diverging walls. The record also shows that a 'cut' laterally undulatory groove of constant depth, with vertical walls, was old (application, page 1, line 29); and both etched (Berliner, No. 382,790) and pressed (ibid. No. 548,623), laterally undulatory grooves of constant depth was old, and that the walls of the etched groove were treated for smoothness.

"Reading into claims 1, 2, and 9 after the word 'cut' the word 'out,' as we do, it is found that the record defined therein differs, among other features, from the record in the prior art, in that the lateral groove in the record in the claims is cut out; in other words, the record pointed out by claims 2 and 9 differs from a cut laterally undulatory groove of substantially constant depth and diverging walls—record in the fact, among other things, that the groove in the record in these two claims is cut out. Or that the record in claims 2 and 9 differs from a cut out vertically undulatory groove with diverging walls, in that in the record in the claims the groove is lateral as distinguished from vertical, and is also of constant depth. The features of lateralness, constant depth, and diverging walls conjointly in one and the same record are not original with the applicant, as the art of record shows, nor is the separate feature of the cut out of the groove new with him, except applied to a laterally undulatory groove. The sound record in claim 1 differs from the cut lateral groove record of the British patent No. 15,206, in that the material is cut out instead of traced or divided, and 'by a tool having edges so sharpened and inclined as to cut (out) the material.' It is not original with the applicant to cut out the material of the tablet to form a groove 'by a tool having edges so sharpened,' etc. (Bell & Tainter), except as to the lateral groove. It will be seen that neither the tool specified, the diverging walls, nor the constant depth separately can serve to point out a record with lateral grooves new with the applicant, but that if the record defined in the claims can be said to be patentable it must be so in the fact of the feature of the cut out of the laterally undulatory

groove, as dominating its fellow features and making out and defining the sound record as a unitary article."

## Johnson's Idea in 1898.

I think it quite clear from the prior art, the proceedings in the Patent Office, the exhibits and testimony that Johnson had clearly in mind the actual cutting out and removal from the groove of a part of the substance of the disk or tablet on which the original record was to be made in the art of making sound records upon tablets of wax or other suitable material of the laterally undulatory groove type, and that he was the first to conceive this idea and reduce it to practice. In August, 1898, he said:

"It is essential in order to produce a clear record that the material be cleanly and neatly cut from the groove in the process of recording so that sharp well-defined lines will be formed in the walls of the groove."

In describing his tool and its operation he says:

"These edges $a'$ are carefully formed to present a cutting edge, so that as the moving record is traveled against the face $a$ of the tool $A$ when held in position, as indicated in Fig. 1, the knife edges $a'$ will clearly cut the material from the record, forming a clean-cut groove, with the undulation or sound waves produced by the vibration of the stylus formed in the record, as shown in Fig. 5 and illustrated in cross-section in Fig. 3."

His Fig. 1 of the parent patent shows the knife, or cutting tool, at work. Fig. 5 shows the groove on the tablet, and Fig. 6 shows the record groove with the laterally undulatory sound waves in the sides thereof. This is beyond anything shown or described in the prior art, or in Jones, and I think was beyond anything Jones had in mind when he applied for his patent, although Jones, broadly speaking, described it, aside from the peculiar form of the groove, elliptical form. Did this originate with Johnson in 1896, as he claims, and before Jones filed his application?

## Was Johnson Prior to Jones?

It is clear that Johnson had been at work in this field, this art, and this particular branch of it, prior to August, 1898, when he filed his application and claimed the cutting tool. It is not therefore improbable that he made his discovery in 1896 when he says he did. It is clear that he knew all about it August 16, 1898, for, as stated, he then had invented and then claimed and later was granted a patent for the cutting tool that would do the work which he described. I think it may be well doubted that Johnson appreciated that, in view of the prior art, he had made a patentable invention in producing a disk sound record such as he described in his parent patent of January 3, 1905, applied for in 1898; that is:

"A disk sound record having a cut out laterally undulatory groove of substantially constant or even depth, such lateral undulations corresponding to the sound waves."

However, he clearly reserved the right to claim it, for he said:

"It is understood, that in reproducing the record thus formed may be used for reproducing purposes directly (that is, reproducing the sounds) or

a more durable and indestructible record may be reproduced by various processes from the original record. (That is duplicates might be made by various processes.) This feature, however, forms no part of my present invention herein described."

That is, he did not go into the feature of a duplication of the original for commercial purposes.

If Johnson himself and his witnesses C. K. Haddon, B. G. Royal, W. H. Nafey, A. C. Middleton, and A. A. DuBois are to be credited—in fact, unless their statements are to be rejected—Johnson made and completed this invention (now held to be an invention) in the early summer or fall of 1896, which included the making of the lateral undulating record of even depth cut in a plate of wax-like material and the making of an electroplate upon such record of wax like material by covering it with plumbago and making it electro-conductive. If this was done, he demonstrated that a matrix made by such process of electroplating the record could be obtained for making duplicate commercial records.

If the testimony is to be credited, Johnson proceeded with due diligence, but did not put out to the public or sell any of his records until about October, 1900, owing to circumstances and conditions fully explained. The Patent Office has decided that Johnson was within his rights under the statutes and rules in delaying his divisional application for the claims in question from 1898 until November 12, 1904. In the meantime Jones was in the field with his application, which was subsequently granted, and from 1900 to 1904 Johnson was putting his records on the market. It may not be out of place to quote the language of the Circuit Court of Appeals in the case of the Columbia Motor Car Co. and Geo. B. Selden v. C. A. Duerr & Co. et al. (the automobile case) 184 Fed. 893, on this question of delay. The court in regard to the Selden patent said:

"This patent was applied for in 1879 and granted in 1895. For over 16 years the application lay in the Patent Office, and the applicant took full advantage of the periods of inactivity permitted by the rules and statutes. It is apparent that he delayed just as long as possible the issue of the patent to him. During this long time the automobile art made marked advances along different lines, and, when in 1895 the patent was granted, it disclosed nothing new. Others had then made the patentee's discovery, and had reduced it to practice in ignorance of what he had done. While he withheld his patent, the public learned from independent inventors all that it could teach. For the monopoly granted by his patent he had nothing to offer in return. The public gained absolutely nothing from his invention whatever it was. From the point of view of public interest it were ∼ ∍n better that the patent had never been granted. * * *

"If the statutes and rules permit unnecessary delays, they should be changed, but we reject the view that this court owes any duty to relieve against their operation. This patent, even if it be useful only for tribute, must be viewed without prejudice and with absolute judicial impartiality."

I do not think it necessary here to go into details of the evidence which leads me to the conclusion that Johnson, corroborated as he is, made this invention in 1896. He either did or he, Haddon, and others have concocted a plausible story, and committed deliberate perjury. I cannot find anything in the case to justify a conclusion that he got

his ideas, incorporated in the specifications of the so called parent patent, from Jones. On the other hand, while there is no evidence that Jones got his ideas from Johnson, he did not seem to appreciate, and certainly did not claim, that he had made any discovery in cutting his groove into not out of the wax-like tablet. He said nothing about actually cutting out a groove by the lateral or zigzag movement of the stylus. In fact, it does not appear from the Jones patent that he did in fact cut out a spiral groove of practically uniform depth containing lateral sinuosities or irregularities corresponding to or representing the sound waves recorded. He claimed nothing of the kind as a discovery or invention, or, if he did, it was rejected and in the rejection he acquiesced. It is easily seen that such a groove as Jones described might have been produced in a soft wax-like material without cutting out any of the material. Such a groove could have been made by displacement, and mere cutting is quite different from cutting out and removing a part of the material. The Jones patent did not issue until December, 1901, and the Johnson cut-out discs were quite well known in 1900. It was easy thereafter to follow the Johnson records as a clean cut-out would, of course, be preferred to a groove of the kind described made by mere displacement. If Jones had in mind a cutting out and removal of any part of the material, it seems to me strange he did not mention it and claim and insist upon a claim for a record made in that way and the method of doing it. All he did claim, or has claimed, and insisted upon was a method for producing commercial sound records which method included the making of an original and then coating it with a conducting material, and then forming a matrix thereon by electrolysis, and then separating this matrix and pressing same into a tablet of suitable material to form the duplicate or commercial records. He placed no stress upon anything else.

In American Graphophone Co. v. Leeds Catlin & Co., 170 Fed. 327, 328, 329, 95 C. C. A. 511, Coxe, C. J., with his well-known accuracy, has fully described and analyzed the Jones patent, and claims and held that Jones is not anticipated by the Adams Randall British patent of July 10, 1888, No. 9,996.

However, it is perfectly clear that Jones was not the inventor of the cutting out process in either the flat disk or the cylindrical sound records. January 9, 1897, 11 months before Jones filed his application, Alfred Coening Clark and said Eldridge R. Johnson filed an application for a patent for a "Sound Recording and Reproducing Machine," which the specifications expressly state was adapted to make records upon either rotating disks or revolving cylinders and the original sound reproduced therefrom. The specifications, after describing the machine and its operation, and the cutting tool or needle point (whichever it was desirable to use), say:

"Our invention is adapted to sound recording and reproducing machines where the records are made upon rotating disks or revolving cylinders and the original sound reproduced therefrom, and is not limited to any particular pattern of machine."

Before that, in describing the machine and its parts, the Clark & Johnson specifications say:

189 F.—24

"The stylus bar *D* at its lower end is preferably longitudinally bored and provided with a thumb-screw *d* for the reception and security of a removable needle-point *d'*, or cutting tool."

Then, later.      1es a description of this cutting tool, viz.:

"This cutting tool *g* is of the ordinary construction of a cutting tool adapted·in producing records upon the record-plates *to remove the material in the form of a shaving* where the material is desired to be removed."

This is the cutting-out process by the vibrating stylus having the cutting tool, instead of a mere needle point pure and simple. The needle point would simply cut and divide and displace the wax-like material of the disk revolved against it and vibrating laterally, if made to vibrate laterally, and would, of course, make a clean zigzag cut merely. but use the cutting tool and machine described and vibrate the tool laterally you would have a clean cut-out groove of even depth with bottom and sides both cleanly cut. You could not cut out a shaving without forming such a groove. If impelled by the·diaphram vertically. the cutting tool would make a cut-out groove with an undulatory bottom, not of even depth, but corresponding to the sound waves, while, if so constructed that the cutting tool would respond to this diaphragm laterally, the cut-out groove would be of even depth and zigzag or one with lateral indulations. This patent shows both the use of a needle point *d'* for merely cutting or tracing and the use of a cutting tool *g* for cutting out a portion of the material. Who first resorted to the lateral movement of the cutting tool in response to the vibrations of the diaphragm in making a sound record of the disc type that of the cut out laterally zigzag groove of even depth so as to have the sound waves recorded in the sides of the groove and in a disc of wax-like material? Clark and Johnson had everything except this, if not this. Then is it at all improbable that Johnson in his efforts to improve did just what he says he did in 1896?

### Infringement by Defendant.

The record substantially concedes infringement by defendant, assuming the Johnson patent to be valid, and no time need be spent on that question, although I am of the opinion that sustaining the Johnson patent in suit does not destroy the Jones patent. I think both are valid, but that Jones includes and uses what belongs to Johnson. In short, should Johnson do just what the Jones patent describes, and all that it describes, he would infringe Jones, while Jones in doing what he does infringes Johnson.

### Defenses.

The defendant presents and urges the following defenses in the following order:

"(1) That complainant is estopped by a decree of this court from asserting that Johnson (or any other person except defendant's patentee Jones) is the inventor of the subject-matter of the patent in suit, is estopped to dispute complainant's ownership of the invention in controversy, and, *a fortiori*, is estopped to assert ownership thereof.

"(2) That defendant has a license under the patent in suit by estoppel.

"(3) That the patent in suit is invalid by reason of two years' prior public use of the invention described and claimed therein.

"(4) That the patent in suit is invalid by reason of direct anticipation."

Claims 2, 3, and 4, I agree with the Patent Office, must have read into them the word "out" so as to read "cut out laterally undulating groove," and "cutting out the laterally undulating groove."

## Estoppel by Judgment.

[2] The defendant claims that estoppel by judgment is made out for the reasons: (1) That there is substantial identity of the subject-matter of the patent in suit with that of the Jones patent, prior both in date of actual application therefor and in issue; and (2) that the present complainant, Victor Talking Machine Company, was a party or privy to the suit between the American Graphophone Company and the Universal Talking Machine Manufacturing Company before referred to, and wherein, it is said, the Jones patent was adjudged to be (1) a good and valid patent; (2) wherein Jones was adjudged to be the first and original inventor of the said Jones invention, whatever it was, and the subject-matter being the same the invention was the same; and (3) wherein it was adjudged that the defendant American Graphophone Company is the owner of the Jones patent and of the invention described therein and covered thereby. I do not regard the invention described in the Jones patent as the same described in the Johnson patent in suit. As stated, the Jones patent does not cover a flat disc with a cut-out laterally undulating or zigzag groove of even depth recording the sound in the sides of such groove. In both claims it covers a method of· producing commercial sound records as fully described and pointed out by Judge Coxe in American Graphophone Co. v. Leeds & Catlin Co., 170 Fed. 330, 331, 95 C. C. A. 511, and before referred to, embracing four steps, each of which steps of itself may have been old and patentable or even patented to some person other than Jones. Judge Coxe says:

"The process of the invention is sufficiently disclosed by the claims, and is as follows: First. Engraving upon a tablet of soft wax-like material by means of lateral vibrations a record groove of uniform depth and having lateral undulations corresponding to the sound waves. Second. Coating the tablet with a conducting material. Third. Forming a matrix thereon by electrolysis. Fourth. Separating the matrix from the original record-disk without the use of heat, and pressing it into a tablet of suitable material to form the ultimate commercial record. It will be observed that the patent relates to disk and not cylindrical records, to soft and not hard recording materials, to record grooves having lateral, and not vertical undulations and to the multiplication of hard copies from the soft original and not a plurality of hard originals. Speaking broadly, it is these distinctions which separate the method of Jones from the prior art."

This process was the Jones invention. It does not follow that the first step, viz., "engraving upon a tablet of soft wax-like material by means of lateral vibrations a record-groove of uniform depth and having lateral undulations corresponding to the sound waves," was not patentable, was not invented by Johnson, and the subject of a valid patent to him.

That the Jones process or method had nothing to do with actually cutting out from a tablet or disc of soft wax-like material, by means of the lateral vibrations, a record groove of uniform depth, and having lateral undulations corresponding to the sound waves, is shown by the evidence of S. T. Cameron, expert for the American Graphophone Company, given in the suit of that company against the Universal Talking Machine Manufacturing Company, hereinbefore referred to and made the basis of this defense of prior adjudication or estoppel by judgment. After describing the etching process by which records of hard material with lateral or zigzag undulations, and having the sound reproduced from the sides of the record groove eaten or etched into such hard substance or metal were made, he fully described the Jones process, and in such description said:

"Instead of etching a zigzag record groove in a metal plate, he embeds the point of a sharp pointed stylus to a predetermined depth in the surface of a tablet of some suitable material, such as wax or a wax-like substance, and forms a zigzag groove of even depth and with smooth walls in said surface by means of a sound recorder."

Again, in defining the claims and specifications, he says:

"By 'cutting' is understood the production of a sound groove by the direct action of a sharp stylus constantly embedded and vibrating laterally in a tablet of wax like material, as distinguished from the indirect operation of first tracing a zigzag line in an etching film spread upon glass or metal and then subjecting the tablet to the action of an acid bath."

But leaving out of question for the time the want of identity between the first step of the Jones process and the corresponding step of the Johnson patent made the subject of specific claims and the only subject thereof, is it true that the adjudication in the case of American Graphophone Co. v. Universal Talking Machine Mfg. Co. did settle as to any one that Jones was the first to discover or invent the process or method of (quoting Judge Coxe) "engraving upon a tablet of soft waxlike material by means of lateral vibrations a record groove of uniform depth and having lateral undulations corresponding to the sound waves?"

Would the defendant have defended successfully the said suit for infringement had it proved and established that it was the first to discover, invent if you please, and reduce to successful practice that step in the process or method of making an original sound record? If the Johnson patent had then been issued on the claims for making an original record, and the American Graphophone Company, in its process of making commercial records, had used that step or process to make its original record, it would have infringed the Johnson patent. But Johnson, even if a party defendant, was not suing for infringement. On the other hand (assuming Johnson had not invented Jones' entire process of making commercial records of this type), if Johnson, with his patent for the claims for making the original record, had made duplicates or commercial records by the Jones process, he would have infringed Jones, assuming the validity of the Jones patent.

It is the Jones process as a whole that gives his patent validity and each of the four steps pointed out by Judge Coxe may have been old and still the patent valid. That a defendant in a suit by Jones for a clear infringement of his process had a valid patent for one of those steps used in the Jones patent, the making of the original record, would not necessarily have defeated Jones in his suit for infringement of his process of making duplicate, or, rather, commercial sound records, unless on the theory that a complainant must come into court with clean hands. Was it necessarily decided in the suit referred to that Jones was the first to invent the method of cutting out from a tablet of wax or wax-like material a groove of substantially even depth with lateral undulations corresponding to the sound waves? I cannot see in view of the Jones patent and the evidence of Mr. Cameron that the point was necessarily involved in that case.

## How was Johnson Involved in That Case?

[3] Johnson was not a party thereto. He did not assume the defense of it. The defendant here contends that the record shows (1) that Johnson organized the Victor Talking Machine Company and has ever since held a majority of its capital stock and controlled its operations and that therefore Johnson and this complainant are identical in interest; (2) that Johnson, as trustee for the Victor Company, acquired the stock of the Universal Talking Machine Company, and has ever since continued to own and control the same as such trustee; (3) that the said Universal Talking Machine Company was the actual defendant in such prior suit, the defendant here having been complainant there; (4) that as result of these facts both Johnson and the Victor Talking Machine Company were directly interested in such prior litigation, and are bound thereby.

The facts or main part of them are set forth in a stipulation, pages 9 and 10 of defendant's record, from which it appears: (A) That on or about the latter part of September, 1900, Johnson commenced the manufacture and sale of disc talking machines and disc sound records such as are described and set forth in the patent in suit. (B) Johnson and others organized the Victor Talking Machine Company October 5, 1901, and said company thereupon acquired the business and good will of Johnson. Down to February 9, 1905, at least, Johnson owned and controlled a majority of the stock of such company. (C) In July, 1903, Johnson obtained a controlling interest in the stock of the Universal Talking Machine Manufacturing Company as trustee for the said Victor Talking Machine Company, and still holds same as such trustee. (D) The suit referred to, on the Jones patent against the Universal Talking Machine Manufacturing Company, was commenced about January 6, 1902, by Jones, and by supplemental bill the American Graphophone Company which had acquired the Jones patent subsequently became complainant. Therefore, when the suit was commenced by the American Graphophone Company, complainant, against the Universal Talking Machine Manufacturing Company, defendant, for the alleged infringement by it of the Jones patent, hereinbefore referred to, and during its progress

Johnson not only held as trustee for the Victor Company a majority of the stock of the said defendant company, but owned a majority of the stock of the said Victor Company. Johnson was not a defendant in that suit, and it was not alleged or proved that he was a contributory infringer. The same is true of the Victor Company. The validity of the Jones patent was in issue, and it was held valid. Does that adjudication bind the Victor Company, which was not a defendant, but, of course, interested in the litigation? Did that adjudication bind Johnson who was not a party, but, of course, interested in the litigation? No judgment or decree could have been pronounced in that suit against either Johnson or the Victor Company. In legal effect the Victor Company was a majority stockholder in the defendant company in that suit. When that suit was commenced January 6, 1902, Johnson had not filed his divisional application for the patent in suit, and, of course, it had not issued. However, Johnson had been making and selling and the Victor Company was then making and selling disc records of the kind described in the Johnson patent now in suit. There is no evidence that those particular records were being made and sold, or made, or sold by the defendant in that suit, the Universal Talking Machine Manufacturing Company.

Is a stockholder in a company individually bound and concluded on the same question by a judgment or decree against his company or corporation? Clearly, neither Johnson individually, nor as trustee, nor the Victor Company was a party to the former suit relied on. Were they or either of them a privy thereto in the legal sense? "The term 'parties' within the meaning of the rule that only parties and privies are concluded by a judgment or a decree includes all those persons who are directly interested in the subject-matter, and who have the right to make defense, control the proceedings, examine and cross-examine witnesses, and appeal from the judgment. Persons not having these rights substantially are regarded as strangers to the cause." Robbins v. Chicago, 4 Wall. 657, 18 L. Ed. 427; Green v. Bogue, 158 U. S. 478, 15 Sup. Ct. 975, 39 L. Ed. 1061; Litchfield v. Goodnow, 123 U. S. 549, 8 Sup. Ct. 210, 31 L. Ed. 199; 1 Greenl. Ev. § 535.

I am of the opinion that a mere stockholder in a company or a corporation has no right to make the defense or intervene and make a separate defense, or to control the proceedings, defense, etc. If a party makes and sells to the trade an article which infringes a patent, and a retailer sells again to a user and such retailer or user is sued for infringement, and the maker comes in and defends, assumes the defense, controls the proceedings in defense where he may examine and cross-examine witnesses, he is a privy and within the rule stated bound by the decree.

Here the defendant claims that Johnson or the Victor Company, one or both, did come in and defend the suit referred to, furnish witnesses, and examine and cross-examine. I am referred in the evidence of Johnson to cross-question 54 and the answer as follows:

"Please state how Mr. Pettit came into the defense of that suit against the Universal Talking Machine Manufacturing Company on defendant's

Jones patent? A. About July, 1903. I secured control of the capital stock of the Universal Talking Machine Manufacturing Company, and the officers of that company employed Mr. Horace Pettit as counsel for the company; not on this exact date, but Mr. Pettit was acting as counsel for that company during the year 1905."

In the other reference it appears that Mr. Pettit did go to Mr. Johnson for information on a certain subject, and was referred by him to a Mr. Nafey and perhaps others.

This falls short of showing that either Johnson or the Victor Company assumed or took charge of that defense so as to become a privy or bound by the decree. Assuming that Johnson recommended Pettit, who was his attorney, he did not, so far as appears, employ or pay him or assume control of the defense, nor did the Victor Company. The officers of the defendant company were in control. I do not find that Mr. Nafey was a witness in that prior suit. I think under the circumstances the Victor Company, owning as it did a majority of the stock of the Universal Talking Machine Manufacturing Company, could have assumed the defense with the consent of the real defendant, but the evidence fails to show that it did. The same is true of Johnson. Johnson made it clear in answer to cross-question 140 that in the suit against the Universal Talking Machine Manufacturing Company, he depended on the officers of that company, and that they conducted the defense. Estoppels must be mutual, and the assumption of the defense must have been open and avowed. Lane v. Welds, 99 Fed. R. 286, 39 C. C. A. 528; Cramer v. Singer, 93 Fed. 636, 35 C. C. A. 508.

### License and Estoppel by Consent.

We come then to the question of the license.

[4] It appears from the evidence of Mr. Johnson as follows:

"Q. 108. Do you know why the Victor Talking Machine Company took a license under the Jones patent No. 688,739? A. At the time the Jones patent was issued the Victor Company had a large quantity of goods on the market. We had no opportunity of avoiding this patent because we did not know of its existence. I therefore sought a license as a matter of insurance. I felt that such course was necessary because of the great value of the goods in question. I never infringe a patent or run the risk of an adverse patent decision where any other course is possible."

On cross-examination (C. Q. 142) he made the same statement as to reason for taking the license. Johnson also says his patent here in suit, No. 896,059 had not issued when such license was taken, and that neither he nor the Victor Company had any assurance it would issue. The license, whatever it was, is not in evidence. Its terms and conditions are not before this court. I am unable to see how a license under the Jones patent to the Victor Company taken before the patent in suit to Johnson had issued and when it was not known it would issue and obtained by Johnson for the Victor Company estops either the Victor Company or Johnson from asserting their rights under the Johnson patent when it did issue, even if its assertion amounts to a repudiation of the validity of the Jones patent. I am not aware that a licensee under a patent is estopped to

purchase a valid patent subsequently issued to another, and which, if asserted, shows the prior patent under which the license was taken to have been invalid and anticipated, and then assert such patent by suit against all infringers including the licensor. I am not pointed to any case so deciding. It is true that a licensee in a suit for royalties agreed to be paid cannot set up and prove as a defense the invalidity of the patent, assuming there is no outstanding decision against the validity of such patent. United States v. Harvey Steel Co., 196 U. S. 310, 25 Sup. Ct. 240, 49 L. Ed. 492; Kinsman et al. v. Parkhurst, 18 How. 289, 292, 293, 15 L. Ed. 385; Eureka Company v. Bailey Company, 11 Wall. 488, 20 L. Ed. 209. However this does not decide that a licensee cannot become the owner of a valid patent covering the same invention after he takes his license, and prosecute all infringers. It would seem to me clear that, if Johnson had retained title to this patent here in suit, he could have prosecuted the Victor Company for infringing it, or any other company or corporation in which he held stock (assuming they actually infringed). His owning stock in such a corporation or a majority of the stock would not carry to it the right to use his inventions except with his consent. He could transfer his patent or inventions to the Victor Company as he did, and it seems to me the rights of that company under it are not affected by the license referred to, the terms of which do not appear. True, this suit is an indirect attack on the Jones patent. But Johnson had no property right in his invention which he could enforce prior to the issue of this patent in 1908. Gayler v. Wilder, 10 How. 477, 493, 13 L. Ed. 504; Marsh v. Nichols Shepard & Co., 128 U. S. 605, 612, 9 Sup. Ct. 168, 32 L. Ed. 538. I have no doubt that the question of Johnson's priority of invention could have been set up in the suit referred to on the Jones patent. But it was not pleaded or made an issue and as the defendant there did not own the invention, and the Victor Company did not, and Johnson was a mere stockholder and did not assume the defense, and the patent had not issued, I am unable to see that this complainant, the Victor Talking Machine Company, is estopped to assert the Johnson patent because of its position as licensee under the Jones patent.

### Globe Record Company Transaction.

[5] The second ground of alleged estoppel is based on the transfer to the American Graphophone Company of a plant, etc., on the 13th day of February, 1902, said to be the plant, etc., of the Globe Record Company, and claimed by defendant to have been a going concern.

The transaction was as follows: Shortly prior to January, 1902, Johnson owned and controlled the Globe Record Company, a small concern located in New York City and engaged in the manufacture of disc sound records designated as "Climax Records," and on or about February 15, 1902, by a written instrument said Johnson delivered the said Globe Record Company to the defendant here, the American Graphophone Company. As we have seen, Johnson owned and controlled a majority of the capital stock of the Victor Talking

Machine Company, complainant here. This transfer of the Globe Record Company was prior to the time Johnson as trustee acquired an interest in the stock of the Universal Talking Machine Manufacturing Company. The written contract of sale, dated February 15, 1902, is between the American Graphophone Company, party of the first part, and Eldridge R. Johnson, as party of the second part, and expressly provides as follows:

"(1) The party of the second part shall deliver unto the party of the first part immediately upon the execution of this agreement the capital stock and all matrices for stamping records and all property and equipment for record making which the party of the second part personally and individually recently acquired of the Globe Record Company, a corporation of the state of New York, having its principal office and place of business in the city of New York, in the same condition in which the same, the said property of the Globe Record Company was received by the party of the second part, wear and tear excepted, the same to be transferred to the party of the first part under the same freedom from liability, but subject to the same liabilities, whatsoever they may be, as when received from the said Globe Record Company, and free from all incumbrances which may have arisen since that time. The party of the second part shall also convey unto the party of the first part information relative to the operation of the said plant of the Globe Record Company such as he may have received from the parties who transferred and assigned the said Globe Record Company property to him. It is expressly understood and agreed that the bank account of the Globe Record Company, whatever it may be, is not hereby transferred, or intended so to be, unto the party of the first part, but shall belong to the party of the second part.

"(2) It is understood and agreed that the suit of the American Graphophone Company against the Globe Record Company and Eldridge R. Johnson now pending in the United States Circuit Court for the Southern District of New York shall be dismissed without costs to either party.

"(3) It is understood by the parties hereto that the Victor Talking Machine Company, of which the said Johnson is President, is not and has not been associated with said Johnson in the ownership or transfer of the said property of the Globe Record Company, which is the individual act of said Eldridge R. Johnson, and that this transfer of the assets and properties of the Globe Record Company carries with it no license or implied license under any patents of the said Victor Talking Machine Company or said Johnson. and the rights of the Victor Company are the same against the said property as they were before the transfer of the property to Johnson."

The defendant here contends that the plant and apparatus so transferred and delivered by Johnson were constructed for the express purpose of making cut zigzag records and were neither adapted nor available for any other purpose, and could be used only for carrying out the process described in the Johnson patent in suit and producing the sound records described in the Johnson patent in suit, and had been used for that purpose, and that Johnson sent a man to instruct defendant company how to efficiently use such apparatus, and that thereafter defendant company proceeded to make sound records and commercial sound records according to that process and with such apparatus. At that time, February 15, 1902, Johnson had not filed his divisional application for the patent in suit and which patent was not granted until 1908, as we have seen. He had described the invention in his parent application. He had commenced making

and putting out such records as early as 1900. If now Johnson owned a plant including machinery for making sound records such as described in his specifications and in his patent, granted later,. both the original records and the copies or commercial records according to the process described in his patent, granted later, and it was in use, a going concern, and he sold it to the defendant company in 1902, as such, and instructed the defendant how to use such plant and the process in making such records and it did use it, and there was no limitation or restriction on the defendant, it would seem unjust and inequitable to restrain or enjoin the defendant company under the Johnson patent granted some six years later. When the Globe concern was transferred by Johnson to this defendant company, he was president of the plaintiff company. The divisional application for the patent in suit was filed November 12, 1904, serial No. 232,389. November 28, 1904, Johnson duly assigned all his interest in the invention, application for a patent therefor, and in any letters patent that might issue thereon to the said Victor Talking Machine Company. Knowledge in Johnson of his invention and original application of which that for the patent in suit was a division, although no divisions had been made in 1902, when the transfer or sale of the Globe Record Company was made, may be and may not be considered information to the Victor Talking Company as Johnson was its president. Paragraph 3 of the agreement between the American Graphophone Company and Johnson for such transfer expressly provides that the Victor Company is not and has. not been associated in any way with Johnson in the ownership or transfer of the Globe Company concern, or of its. property. This, of course, was notice that the Victor Company assumed no responsibility by reason of such transfer and had no knowledge of its. business. That paragraph also expressly provides that the transfer of the assets and properties of the Globe Company "carries with it no license or implied license under any patents of the said Victor Talking Machine Company, or said Johnson," and that "the rights of the Victor Company are the same against the said property as they were before the transfer of the property to Johnson." If the words "carries with it no license or implied license under any patents of the said Victor Talking Machine Company, or said Johnson" referred to, or are to be construed to refer and apply to all subsequent patents issued to or acquired by the Victor Company, or said Johnson, including any patent they or either of them might obtain for the very process, or product or both, then being practiced or used and produced by the Globe Record Company, then neither the Victor Company nor Johnson were or are estopped in any sense from asserting their rights under the Johnson patent now in suit. If, on the other hand, it only referred to patents then in existence and in. the minds of both the parties to the agreement, those in existence and relating to the process and apparatus used by the Globe Record Company, then clause or paragraph 3 of the contract, so far as it refers to patents, has no special bearing on this question of estoppel.

As stated, the suit of the American Graphophone Company

against the universal Talking Machine Manufacturing Company in which the Victor Company and Johnson were interested in the manner and to the extent stated was commenced in January, 1902, while the sale of the Globe Record Company to the American Graphophone Company took place about a month later. The validity of the Jones patent was then a matter which the Victor Company, Johnson, and the American Graphophone Company must have been considering more or less. If Johnson at the time said agreement was executed had in mind and expected by a division of his then pending application and in which he described the process, &c., then in use by the Globe Company to assert and prosecute a claim to a patent therefor, he made no reference to such a situation in the agreement or to such a claim on his part. The Victor Company at that time had no interest in the Johnson invention here in question. It took its assignment about two years later. However, the Graphophone Company was necessarily interested in the question. Johnson by mere silence that he was going to claim a patent for the process &c., used by the Globe Company, and saying that his transfer to the Graphophone Company gave no implied license "under any patents of the said Victor Talking Machine Company, or said Johnson," would hardly do his full duty to the American Graphophone Company. The claim is that by such silence he misled the Graphophone Company to its prejudice, and by allowing it to go on, which he knew it probably would do, impliedly licensed it to do all that it has done, or is now doing, which infringes in any way the patent in suit granted some six years later.

E. D. Easton, a witness for defendant here, says that the Globe Record Company was purchased by defendant about February 12, 1902, or a few day later, and reads from his diary as follows:

"Cromelin reported by telephone that Johnson would give us the Globe Record Company and all its assets and also show us all about English's system if we would discontinue our litigation; that he would give us a decree if we did not enforce the patents against him."

He then says they went to Philadelphia and made the settlement of the litigation in which settlement Johnson gave them the Globe Record Company. He also says that February 15th, they went to the laboratory in Philadelphia and saw the matrices packed and got the records; that the matrices were returned to the Burt Company, Milburn, N. J., from whence they had come, and that the records were turned over to Victor H. Emerson; that the Burt Company pressed records from the matrices and these were sent to the Columbia Phonograph Company and sold to the public.

It appears from the evidence of one Palmer that he was manager of the Burt Company in 1901 and 1902, which company received matrices for sound records from the Globe Record Company, and pressed records and sent them back to the Globe Company, and that subsequently the matrices passed to the control of the American Graphophone Company. I do not find substantial evidence that Johnson did instruct or cause to be instructed this defendant in his new process now covered by the patent in suit. If some of the matrices

were of that character and they passed to the defendant undoubtedly, it could use them until worn out, but that fact alone would not carry title to the process or method of producing or the right to make new ones or practice the method, etc., after the issue of a patent. Again, I do not think the evidence shows the Globe Record Company was a going concern when the transfer was made. It is stipulated in the record that in the month of July, 1901, the Globe Record Company made and sold "zigzag disc sound records in commercial quantities and issued a catalog"; that in September, 1901, an oral agreement was made between the Globe Record Company and the defendant or its subsidiary company, the Columbia Phonograph Company General, whereby the Globe Company was to make and sell and the other party to purchase commercial sound records. This, of course, did not transfer the process or method of producing or license the making and selling according to Johnson's method.

In Leggett v. Standard Oil Company, 149 U. S. 287, 293, 294, 13 Sup. Ct. 902, 37 L. Ed. 737, the plaintiff had discovered a process which he thought patentable, but he disclosed same to the defendant who promised not to use it, but did. The plaintiff thereupon obtained a patent and sued the defendant for infringement and defendant set up the invalidity of the patent. The plaintiff claimed the defendant, because of his promise and use, was estopped to deny the validity of his patent. Held untenable. In the absence of expressly proved fraud, there can be no estoppel based on the acts and conduct of the party sought to be estopped where such acts and conduct are as consistent with honest purpose and absence of negligence as with their opposites, and the facts constituting the estoppel must be clearly and distinctly and satisfactorily proved. Arrott v. Standard S. Mfg. Co. (C. C.) 131 Fed. 457, affirmed 135 Fed. 750, 68 C. C. A. 388. The complainant here starts with the presumption of the validity of its patent in suit. If the complainant's patent is valid, the defendant infringes.

November 19, 1897, about two years after Jones filed his application for his patent, he attempted to amend by inserting the following claims.

"(1) The herein-described method of producing original sound records, which consists of cutting or engraving upon a tablet of suitable material, by means of the lateral vibrations of a suitable stylus, a record groove of appreciable and practically uniform depth, the same having lateral undulations corresponding to the sound waves, substantially as described.

"(2) An original sound record formed of a wax-like material and having engraved upon its surface a spiral groove containing lateral undulations of uniform depth, the depth being slight but appreciable, and the undulations corresponding to sound waves, substantially as described."

These claims were rejected on the prior art and Jones acquiesced. Defendant cannot be heard now to say these rejected claims formed any part of the Jones invention. As I look at it, Johnson claimed and was granted a patent for what in substance was denied to Jones.

Jones claimed but was denied a patent for (1) the method of producing an original sound record which consisted in (a) cutting or engraving upon a tablet of suitable material, (b) by means of

the lateral vibrations of a suitable stylus, (c) a record groove of appreciable and practically uniform depth, and (d) the latter having lateral undulations corresponding to the sound waves. And, again, the product, viz., (1) an original sound record, (2) formed of a wax like material, and (3) having engraved upon its surface a spiral groove, (4) containing lateral undulations of uniform depth, the depth being slight but appreciable, and (5) the undulations (lateral) corresponding to sound waves.

The patent granted Jones is for a method for producing commercial sound records which consists in, (a) cutting or engraving upon a tablet of suitable material, (b) by means of the lateral vibrations of a suitable stylus, (c) a record groove of appreciable and practically uniform depth, and (d) having lateral undulations corresponding to the sound waves, as step 1 and then coating the same, etc. In short, it stands out perfectly plain that the first step of the Jones method or process which consists in making the original record was claimed by Jones as his invention and rejected on the prior art. It was subsequently patented to Johnson as the inventor thereof. I can draw no distinction between what Jones claimed and had rejected and claim 3 of the Johnson patent in suit. Johnson (a) cuts on a tablet of suitable material (b), by means of the lateral vibrations of a suitable stylus, (c) a record groove of appreciable and substantially uniform depth, (d) having lateral undulations corresponding to the sound waves. Wherein does this differ from the rejected Jones claim and step 1 of the Jones process or method? And why is it not patentable? It is the making of the original record which may be used to reproduce sound. However, it would not be a commercial success as a sound record for reproducing sounds because not durable. But the commercial records could not be produced without it. Add the other steps of the Jones method or process, and we have the successful commercial records of Jones. But in practicing the Jones process the defendant infringes the Johnson patent. Clearly defendant infringes claim 3 of the patent in suit. And as clearly to my mind the defendant infringes all the claims of the patent in suit in issue here unless it be claims 14 and 23 which add in broad terms the production of duplicates or commercial records from the original by any process, or any means which will accomplish the end. The defendant insists there is only one known process of producing duplicates from the original, and that the one described in the Jones patent and there claimed.

All Johnson says in the patent in suit as to reproducing sound records from the original is:

"It is understood that in reproducing the record thus formed may be used for reproducing purposes directly, or a more durable and indestructible record may be reproduced by various processes from the original record."

He does not point out or describe or claim either one of the "various processes" referred to. Jones did and does and was granted a patent for that particular or specific process of reproducing a more durable and indestructible record; that is, the commercial sound records for use in reproducing the recorded sounds, music, or speech. I cannot find that Johnson anticipated or was prior to Jones in his

method or process described in his patent, No. 688,739 dated December 10, 1901, for reproducing sound records from the original record made according to the Johnson invention—that is, by coating such original with a conducting material—then forming a matrix thereon by electrolysis, and finally separating this matrix and pressing the same into a tablet of suitable material in the way described, or, in the language of claim 2, by next rendering the surface thereof (of the original record) electrically conductive, then forming a matrix thereon by electrolysis, next separating the matrix from the original record disk without the use of heat, and finally impressing said matrix into a disk of suitable material to form the ultimate record. Whether or not this part of the Jones patented process was old in the art does not concern this litigation. The defendant infringes the Johnson patent now owned by complainant, by using his method or process of producing the original record and his patented original record from which the duplicates are subsequently made. If there are methods of reproducing records from the original record other than that described and claimed by Jones, clearly the complainant may use it without fear of the Jones patent.

There will be a decree accordingly, with costs, and for an accounting.

In view of all the prior litigation and all the facts, I may as well say here that, if the defendant desires to appeal and takes its appeal within thirty days from the entry of the decree hereon, the issue of an injunction will be suspended pending such appeal and until the determination thereof, provided it gives a bond in the sum of $10,000, conditioned to pay all costs, damages, and profits awarded against it herein, and provided it moves such appeal to a hearing promptly by asking that same be advanced.